[No. B142321, Second Dist., Div. Three. Oct. 25, 2001.]

LISA ELLEN SMITH, Plaintiff and Respondent, v.
PACIFICARE BEHAVIORAL HEALTH OF CALIFORNIA, INC., et al.,
Defendants and Appellants.

[No. B145004, Second Dist., Div. Three. Oct. 25, 2001.]

GEORGE RIVERA, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
PACIFICARE OF CALIFORNIA, Real Party in Interest.

## COUNSEL

Konowiecki & Rank, Gary S. Pancer; Greines, Martin, Stein & Richland and Timothy T. Coates for Defendants and Appellants and for Real Party in Interest.

Shernoff, Bidart & Darras, Michael J. Bidart and Jeffrey Isaac Ehrlich for Petitioner and for Plaintiff and Respondent.

## OPINION

**CROSKEY, J.**—These consolidated proceedings involve the question whether a health care service plan may enforce an arbitration clause contained in the plan and in related subscriber agreements which does not comply with the statutory disclosure requirements applicable to such clauses. In case No. B145004, the petitioner, George Rivera, seeks a writ of mandate vacating a trial court order granting the motion of the real party in interest,

PacifiCare of California (PacifiCare), to compel arbitration in accordance with the plan's arbitration clause. In case No. B142321, PacifiCare has appealed the order of the trial court denying PacifiCare's motion to compel arbitration pursuant to the same clause. The respondent, Lisa Ellen Smith, makes the identical arguments in support of the trial court's order in her case as does Rivera in his.[1]

As a part of its regulation of health care service plans, California imposes certain disclosure requirements as a predicate to the enforcement of arbitration clauses contained in plan subscriber agreements. Health and Safety Code section 1363.1 (section 1363.1) (see fn. 15, *post*) provides that a binding arbitration clause in a health care service plan must incorporate various disclosures, including a clear statement of "whether the subscriber or enrollee is waiving his or her right to a jury trial . . . ." The waiver language must be substantially in the wording provided in Code of Civil Procedure section 1295, subdivision (a),[2] and must appear immediately before the signature line for the individual enrolling in the plan. (§ 1363.1, subds. (c), (d).)

These cases present the question whether the failure to comply with the mandate of section 1363.1 will invalidate the right of PacifiCare to enforce the arbitration clause in its subscriber agreements with Smith and Rivera. Although it has been held that the provisions of the Federal Arbitration Act (9 U.S.C. § 1 et seq.) (hereafter FAA) preempt section 1363.1 and prevent its enforcement, what has not yet been decided by a California court, is whether the McCarran-Ferguson Act (15 U.S.C. § 1011 et seq.) (hereafter McCarran-Ferguson) overrides the FAA and precludes its preemptive impact on section 1363.1. This is a significant issue, the resolution of which will turn on whether section 1363.1 constitutes a regulation of the business of insurance within the meaning of McCarran-Ferguson.

After a careful examination of the relevant authorities, we are persuaded that section 1363.1 does constitute such regulation and therefore, the FAA cannot preempt section 1363.1 and the latter's provisions must be enforced.

---

[1] We have consolidated these cases on our own motion. While they involve different plaintiffs in the underlying actions, the defendant, PacifiCare (and related entities) is the same in both cases, the relevant factual issues are very similar and the legal issues are identical. Moreover, counsel are the same and they make identical arguments in both cases. Thus, it is appropriate that the cases be decided in a single opinion.

[2] Code of Civil Procedure, section 1295, subdivision (a), specifies the language which must be utilized in an arbitration clause inserted in any contract for medical services. It provides that the clause must state that any dispute as to professional negligence will be determined by arbitration "and not by a lawsuit or resort to court process," and that the parties "are giving up their constitutional right to have any such dispute decided in a court of law before a jury . . . ."

As a result, we will grant the requested writ relief in case No. B145004 and will affirm the trial court's order in case No. B142321.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

As we summarize below, Rivera and Smith have each filed an action against PacifiCare seeking damages for injuries sustained as the result of PacifiCare's alleged failure to provide promised plan benefits, including the failure to timely authorize or extend needed treatment by health providers. In each case, PacifiCare responded to the complaints with a motion to compel arbitration.

1. *Rivera Background Facts (Case No. B145004)*

In May of 1999, Rivera was an employee of the County of Los Angeles (County). County had previously entered into a contract with PacifiCare to provide health insurance for its employees (referred to in the PacifiCare documents as members). The agreement between PacifiCare and County consists of a "Business Agreement" (signed by County)[4] and three forms of "subscriber agreements" depending on the coverage option selected by the member. All forms of the subscriber agreements contained an arbitration clause to which each member became bound upon his or her execution of the enrollment form.[5] In addition, the evidence of coverage booklet (31 pages),

---

[3]There is no dispute between the parties as to the relevant facts. We recite only those facts necessary to describe the context for the legal issue that we resolve.

[4]The Business Agreement was actually entered into not only by PacifiCare, but also a related company, PacifiCare Life and Health of California. Our reference to PacifiCare shall be deemed to include both companies. The Business Agreement expressly provides that both companies are to "act in the capacity of the *County's insurer*" (italics added) with respect to all other services and supplies provided under the group benefits agreements and under the Business Agreement.

[5]At paragraph 15.02 of the subscriber agreement the following provision is set out in capital letters and in bold type:

"15.02 ARBITRATION. PACIFICARE USES BINDING ARBITRATION TO RESOLVE ANY AND ALL DISPUTES BETWEEN PACIFICARE AND GROUP OR MEMBER, INCLUDING, BUT NOT LIMITED TO, ALLEGATIONS AGAINST PACIFICARE OF MEDICAL MALPRACTICE (THAT IS AS TO WHETHER ANY MEDICAL SERVICES RENDERED UNDER THE PACIFICARE HEALTH PLAN WERE UNNECESSARY OR UNAUTHORIZED OR WERE IMPROPERLY, NEGLIGENTLY OR INCOMPETENTLY RENDERED) AND OTHER DISPUTES RELATING TO THE DELIVERY OF SERVICES UNDER THE PACIFICARE HEALTH PLAN. PACIFICARE, GROUP AND MEMBER EACH UNDERSTAND AND EXPRESSLY AGREE THAT BY ENTERING INTO THE PACIFICARE SUBSCRIBER AGREEMENT OR ENROLLING IN THE PACIFICARE HEALTH PLAN AND AGREEING TO BE BOUND BY THE PACIFICARE SUBSCRIBER AGREEMENT, PACIFICARE, GROUP AND MEMBER ARE EACH VOLUNTARILY GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE ALL SUCH DISPUTES DECIDED IN A COURT OF LAW BEFORE A JURY, AND INSTEAD ARE ACCEPTING THE USE OF BINDING ARBITRATION.

provided to each member following enrollment, contained a further reference to the commitment to arbitrate any dispute.[6]

Following his enrollment in the PacifiCare plan, Rivera was diagnosed, on May 18, 1999, as suffering from a severe bacterial infection in his left foot. In the complaint he subsequently filed against PacifiCare, he alleged he was denied timely and proper treatment for this condition.[7] He had to wait three days for authorization to see a specialist. By the time of that appointment his condition had progressed to gangrene, and the surgeon recommended, on May 21, 1999, that he be admitted to the hospital that day, and that the small toe on his left foot be amputated within 24 to 48 hours, after antibiotics had controlled the infection. However, the medical group exercising its delegated authority to make utilization management decisions for respondent PacifiCare refused to authorize an admission to the hospital. When he was reexamined two days later, his infection had spread.

When Rivera's doctor learned, on May 23, 1999, that Rivera had not been admitted to the hospital as he had directed, he told Rivera to come to the hospital the next morning at 6:00 a.m. for admission and surgery on his foot. When Rivera arrived, however, he learned he was *not* on a list of patients whose admission had been authorized, and he was required to wait for hours. It turned out that Rivera's admission had not been authorized by a "hospitalist," a doctor employed by the participating medical group to coordinate hospital admissions and care. He was not seen by the hospitalist for another five hours. Because of the delay in admission, Rivera's surgery was not scheduled until the following day.

GROUP AND MEMBER FURTHER UNDERSTAND THAT ANY DISPUTES BETWEEN GROUP OR MEMBER AND A PACIFICARE CONTRACTING PROVIDER, INCLUDING, BUT NOT LIMITED TO, CLAIMS AGAINST A PACIFICARE CONTRACTING PROVIDER FOR MEDICAL MALPRACTICE, ARE NOT GOVERNED BY THE PACIFICARE SUBSCRIBER AGREEMENT. HOWEVER, PACIFICARE, GROUP AND MEMBER EACH EXPRESSLY AGREE THAT THE EXISTENCE OF ANY DISPUTES BETWEEN GROUP OR MEMBER AND A PACIFICARE CONTRACTING PROVIDER, INCLUDING, BUT NOT LIMITED TO, CLAIMS BY GROUP OR MEMBER AGAINST A PACIFICARE CONTRACTING PROVIDER FOR MEDICAL MALPRACTICE, SHALL IN NO WAY AFFECT THE OBLIGATION TO SUBMIT TO BINDING ARBITRATION ANY AND ALL DISPUTES BETWEEN GROUP OR MEMBER AND PACIFICARE."

[6]The reference to arbitration in the evidence of coverage documents provide that if a member is dissatisfied with the result of a redetermination made by PacifiCare under its "Appeals Process," then he or she may "within sixty (60) days, submit or request that PacifiCare submit the appeal to voluntary mediation or binding arbitration before the American Arbitration Association." Following an extended discussion of the conduct of the mediation and arbitration process, the discussion of the Appeals Process concludes: "MEMBERS UNDERSTAND THAT BY ENROLLING IN PACIFICARE, THEY AGREE TO GIVE UP THEIR CONSTITUTIONAL RIGHT TO HAVE ANY DISPUTE DECIDED IN A COURT OF LAW BEFORE A JURY AND INSTEAD ARE ACCEPTING THE USE OF ARBITRATION FOR RESOLVING DISPUTES WITH PACIFICARE."

[7]For purposes of this appeal, we accept these allegations as true.

After one of Rivera's doctors told Rivera's wife that he should have had the surgery three days earlier, she insisted that the surgery go forward. The surgeon arrived at 7:00 p.m. and was displeased at having been summoned; however, when he saw how far the infection in Rivera's foot had progressed he scheduled the surgery immediately. The operation began at midnight. The infection had spread during the time Rivera had been waiting for care, so that instead of having only his small toe amputated, it was necessary to remove two toes and a portion of the foot. A week after the surgery, Rivera's surgeon referred him for hyperbaric oxygen treatment, a therapeutic technique used to promote healing in necrotic tissue. The surgeon noted in the chart that Rivera's need was "urgent." Once again, however, PacifiCare delayed authorization for the prescribed treatment. Unfortunately, because of such delay, the gangrene progressed, and Rivera's surgeon recommended an amputation of the entire foot, above the ankle. When Rivera arrived at the hospital at 6:00 a.m. on the scheduled day, he was again kept waiting for hours—this time for an entire day—because of the need for the plan's hospitalist to admit him.

Not surprisingly, Rivera claims to have suffered substantial physical and emotional damage as a result of such conduct. Thereafter, he filed this action against PacifiCare on May 11, 2000.[8] In his first amended complaint (in which he is joined by his spouse, Rita Rivera), filed on June 14, 2000, he alleged 14 causes of action.[9]

PacifiCare's response was to file a motion to compel arbitration. This was heard by the trial court on August 15, 2000, and the motion was granted. Rivera filed a petition for a writ of mandate on October 13, 2000. Following some delay occasioned by the filing of additional briefing both in support of and in opposition to the petition, we issued an order to show cause on March 15, 2001, and set the matter on calendar for hearing with the Smith appeal (case No. B142321).

---

[8] The PacifiCare entities named as defendants are PacifiCare of California, PacifiCare Health Systems Foundation, a California corporation, and PacifiCare Health Systems, Inc., a Delaware corporation. As before, our use of the term "PacifiCare" is intended to include all of these entities.

[9] The 14 causes of action alleged by the Riveras are: (1) breach of the duty of good faith and fair dealing; (2) conspiracy to breach the duty of good faith and fair dealing; (3) breach of contract; (4) intentional misrepresentation; (5) professional negligence; (6) negligent interference with a contractual relationship; (7) intentional interference with a contractual relationship; (8) intentional interference with a patient/physician relationship; (9) negligent interference with a patient/physician relationship; (10) breach of fiduciary duty; (11) unfair business practices (Bus. & Prof. Code, § 17200); (12) intentional infliction of emotional distress; (13) negligent infliction of emotional distress; and (14) injunctive relief for violation of Civil Code Section 1750 et seq. (the Consumer Legal Remedies Act).

## 2. Smith Background Facts (Case No. B142321)

Smith filed her complaint on October 26, 1999.[10] In that pleading, she alleged the factual basis for her claim against PacifiCare.[11] She is the stepdaughter and dependent of Thomas S. Battle, an administrator for the Rim of the World Unified School District in Lake Arrowhead. As an employee of the school district, Battle had the option of enrolling in the health plan offered through the Southern California Schools Employee Benefits Association. Under this plan, he received the bulk of his health care coverage from the Blue Cross Plus Preferred Provider Plan. Mental health benefits, however, were derived solely from a supplemental health plan sponsored by PacifiCare and marketed as PacifiCare Behavioral Health of California (PBHC). Smith, as Battle's dependent, was also covered under this mental health plan. This plan has language compelling arbitration to resolve any disputes that may arise. Such language is substantially the same as we have already described with respect to the Rivera action. (See fn. 5, ante.)[12]

Smith became suicidal in 1998 due to an uncontrolled major psychiatric depressive disorder, bulimia nervosa, and anorexia nervosa. In response, PacifiCare terminated her physician-recommended inpatient treatment after only six days and refused to authorize or pay for additional inpatient care even when Smith's condition deteriorated further over the next two months. Such termination of the inpatient treatment appears to have been dictated by the terms of PBHC's plan. This plan offers to provide full coverage for inpatient stays up to 30 days. However, members are limited to one inpatient

---

[10]In this pleading, the named defendants were PacifiCare Behavioral Health of California, Inc.; PacifiCare of California; PacifiCare Health Systems Foundation, a California corporation; and PacifiCare Health Systems, Inc., a Delaware corporation. While one of these defendants is not a party to the Rivera action, we nonetheless intend that our reference to the term "PacifiCare" includes all of these entities.

[11]In her complaint, Smith alleged 10 separate causes of action: (1) breach duty of good faith and fair dealing; (2) breach of contract; (3) intentional interference with a patient/physician relationship; (4) negligent interference with a patient/physician relationship; (5) breach of fiduciary duty; (6) intentional infliction of emotional distress; (7) negligent infliction of emotional distress; (8) professional negligence; (9) injunctive and equitable relief for violation of Business and Professions Code section 17200; and (10) injunctive relief for violation of Civil Code section 1750. As in the Rivera case, we accept Smith's allegations as true for purposes of this appeal.

[12]For example, the evidence of coverage for the PacifiCare mental health plan included the provision that if subscriber was dissatisfied with PacifiCare's internal Appeals Procedure, then a request for binding arbitration to the American Arbitration Association could be submitted. After outlining the various aspects and contingencies of the arbitration process, the section on Appeals Procedure concluded with the following: "By ENTERING INTO THIS AGREEMENT, YOU AND YOUR DEPENDENTS AGREE TO GIVE UP YOUR CONSTITUTIONAL RIGHTS TO HAVE ANY DISPUTE DECIDED IN A COURT OF LAW BEFORE A JURY AND INSTEAD ACCEPT THE USE OF ARBITRATION FOR RESOLVING DISPUTES WITH PBHC."

stay per year, and *stays of less than five days do not count toward this limitation.* By terminating Smith's inpatient treatment only six days after her admission, PacifiCare effectively ensured that, regardless of the state of Smith's mental health, the inpatient benefits Smith received could be kept to the minimum. PacifiCare's actions also ensured that Smith would receive no further inpatient benefits from PacifiCare for the balance of the year.

In filing her complaint, Smith, as did Rivera, sought substantial damages for the injuries she claimed to have sustained as the result of PacifiCare's alleged misconduct. PacifiCare responded to this complaint in the same manner as it did to the Rivera action. On December 15, 1999, it filed a petition to compel arbitration relying on the contractual provisions discussed above.

On February 4, 2000, after reviewing the written arguments filed in support of and opposition to PacifiCare's petition, the trial court heard the argument of counsel and denied the petition. This is an appealable order (Code Civ. Proc., § 1294; *Fireman's Fund Ins. Companies v. Younesi* (1996) 48 Cal.App.4th 451, 456-457 [55 Cal.Rptr.2d 671]) and PacifiCare filed a timely appeal.

We thus have before us two different cases, involving substantially the same relevant factual circumstances, the same defendants, the same counsel on both sides and the same legal issue as to which two different trial judges reached the exact opposite conclusion.

## CONTENTIONS OF THE PARTIES

Rivera and Smith (hereafter collectively referred to as plaintiffs) contend as follows:

1. PacifiCare is a health care service plan subject to the regulation of the Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq.) (Knox-Keene Act), including section 1363.1;

2. The arbitration clauses of the PacifiCare agreements which PacifiCare sought to enforce by its petitions to compel arbitration do not comply with the mandatory disclosure requirements of section 1363.1 and therefore (absent the preemption issues raised herein) are unenforceable as a matter of law;

3. Health care service plans such as PacifiCare's are engaged in the business of insurance and section 1363.1 is a state law that regulates the business of insurance;

4. McCarran-Ferguson exempts a state law that regulates insurance from preemption by any federal statute, the effect of which would "impair, invalidate or supercede" such state law, *unless* the federal statute "*specifically relates to insurance.*"

5. The FAA would preempt and preclude the operation of section 1363.1, unless McCarran-Ferguson is applicable;

6. The FAA is a statute of general application and does *not* specifically relate to insurance; if the FAA were applied in either of these cases it would "impair, invalidate or supercede" the operation of section 1363.1;

7. Since the FAA cannot be applied without violating the mandate of McCarran-Ferguson, it cannot preempt section 1363.1; since the PacifiCare arbitration clauses do not comply with section 1363.1, PacifiCare is not entitled to enforce its demands for arbitration and its motions for such relief were improperly granted in the Rivera matter and properly denied in the Smith case.

Of the seven points made by the plaintiffs in the above summarized contentions, *PacifiCare concedes that five are not disputed.* The only points of disagreement which PacifiCare has are with contention No. 3 and the conclusion expressed in contention No. 7. It is PacifiCare's position that health care service plans are *not* engaged in the business of insurance and section 1363.1 is *not* a statute which regulates insurance. If PacifiCare is correct, then McCarran-Ferguson cannot be applied in this matter to preclude the preemptive effect of the FAA.

The problem presented by these consolidated matters is therefore both straightforward and focused; we must decide two questions. First, are health care service plans, such as PacifiCare's, engaged in the business of insurance? Second, is section 1363.1 a state law that regulates the business of insurance? We answer yes to both questions.

DISCUSSION

1. *Applicable General Principles and Undisputed Matters*

We begin our consideration of these questions by summarizing the factual matters and legal principles as to which there is no real dispute.

PacifiCare concedes that it is a licensed health care service plan.[13] Instead of purchasing individual or group health insurance, many persons and employers now contract with health maintenance organizations (HMO's) which, in turn, contract with health care providers (e.g., doctors, hospitals, medical groups, etc.) to provide actual health care services. (See, e.g., *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1289 [22 Cal.Rptr.2d 20].) "Beginning in the late 1960's, insurers and others developed new models for health-care delivery, including HMOs. [Citation.] The defining feature of an HMO is receipt of a fixed fee for each patient enrolled under the terms of a contract to provide specified health care if needed. The HMO thus assumes the financial risk of providing the benefits promised: if a participant never gets sick, the HMO keeps the money regardless, and if a participant becomes expensively ill, the HMO is responsible for the treatment agreed upon even if its cost exceeds the participant's premiums." (*Pegram v. Herdrich* (2000) 530 U.S. 211¡ 218-219, 147 [120 S.Ct. 2143, 1249, 147 L.Ed.2d 164, 174-175].)

In California, health care service plans (or HMO's) are licensed and regulated by the Department of Managed Care under the Knox-Keene Act.[14] As already noted, one of the provisions of that act is section 1363.1.[15]

█ The arbitration provisions of the PacifiCare agreements with the plaintiffs did not comply with the disclosure requirements of section 1363.1.

---

[13]In a declaration filed in support of PacifiCare's petition to compel arbitration it is stated: "PacifiCare is licensed in accordance with the Knox-Keene Health Care Service Plan Act of 1975, as amended, Cal. Health & Safety Code Section 1340 *et seq. PacifiCare is a health care service plan that arranges for and facilitates the provision of health services for employer groups with which they contract.*" (Italics added.)

[14]However, "[h]ealth care service plans under the Knox-Keene Act are generally subject to the jurisdiction of the Commissioner of Corporations (§ 1341), *not* the Insurance Commissioner. Thus, Insurance Code section 740, subdivision (g), exempts health care service plans from Department of Insurance jurisdiction (though the Commissioner of Corporations is to consult with the Insurance Commissioner to ensure consistency of regulations to the extent practicable under section 1342.5). Regulations concerning health care service plans are found in title 10 of the California Code of Regulations, section 1300.43 et seq." (*Williams v. California Physicians' Service* (1999) 72 Cal.App.4th 722, 729 [85 Cal.Rptr.2d 497], fn. omitted.)

[15]Section 1363.1 provides: "Any health care service plan that includes terms that require binding arbitration to settle disputes and that restrict, or provide for a waiver of, the right to a jury trial shall include, in clear and understandable language, a disclosure that meets *all* of the following conditions:

"(a) The disclosure shall clearly state whether the plan uses binding arbitration to settle disputes, including specifically whether the plan uses binding arbitration to settle claims of medical malpractice.

"(b) The disclosure shall appear as a separate article in the agreement issued to the employer group or individual subscriber *and shall be prominently displayed on the enrollment form signed by each subscriber or enrollee.*

"(c) The disclosure shall *clearly state whether the subscriber or enrollee is waiving his or her right to a jury trial for medical malpractice, other disputes relating to the delivery of service*

Essentially, the disclosures made in the agreements were not placed in the mandated juxtaposition with the enrollee's signature line and did not clearly disclose the scope of the arbitration as required by section 1363.1. PacifiCare does *not* dispute that there was a failure to comply with the requirements of section 1363.1. Instead, PacifiCare argues that such failure is irrelevant because section 1363.1 is preempted by the FAA and therefore does not apply.

■ The FAA applies to any "contract evidencing a transaction involving commerce" which contains an arbitration clause. (*9 U.S.C. § 2.*) Section 2 of the FAA provides that arbitration provisions shall be enforced, "save upon such grounds as exist at law or in equity for the revocation of any contract." (*Ibid.*) Thus, a state court may, without violating section 2, refuse to enforce an arbitration clause on the basis of "generally applicable contract defenses, such as fraud, duress, or unconscionability." (*Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687 [116 S.Ct. 1652, 1656, 134 L.Ed.2d 902, 909] (*Casarotto*).) Critically, however, a state court may not defeat an arbitration clause by applying state laws "applicable *only* to arbitration provisions." (*Ibid.*)

Thus, in *Casarotto*, the Supreme Court found that the FAA preempted a Montana law which had required an arbitration clause to be typed in underlined capital letters on the first page of any contract in order to be enforceable. (*Casarotto, supra,* 517 U.S. 681, 683 [116 S.Ct. 1652, 1654].) Because the Montana law conditioned enforceability of the arbitration agreement "on compliance with a special notice requirement not applicable to contracts generally," it was preempted. (*Id.* at p. 687 [116 S.Ct. at p. 1656].)

■ The FAA would appear to apply to the PacifiCare agreements at issue here. First, the contract involves interstate commerce. In providing health services to enrollees, PacifiCare must, and does, contract with out-of-state entities. In addition, the agreement provides that PacifiCare will arrange for the provision of health services for enrollees, wherever they may travel, including out of state. These circumstances bring the PacifiCare agreements within the reach of the FAA. (See, e.g., *Summit Health, Ltd. v. Pinhas* (1991) 500 U.S. 322, 329 [111 S.Ct. 1842, 1847, 114 L.Ed.2d 366, 375] [Medicare provider that purchased out of state medicines and supplies

---

*under the plan, or both,* and shall be substantially expressed in the wording provided in subdivision (a) of Section 1295 of the Code of Civil Procedure.

"(d) In any contract or enrollment agreement for a health care service plan, *the disclosure required by this section shall be displayed* immediately before the signature line provided for the representative of the group contracting with a health care service plan and *immediately before the signature line provided for the individual enrolling in the health care service plan.*" (Italics added.)

engaged in interstate commerce for purposes of the Sherman Act]; *Toledo v. Kaiser Permanente Medical Group* (N.D.Cal. 1997) 987 F.Supp. 1174, 1180 [HMO contract concerned interstate commerce under FAA, where coverage provided for out-of-state injuries or illness and HMO obtained physicians and supplies from out of state].)

Moreover, section 1363.1 is obviously a regulatory provision applicable *only* to arbitration provisions, not to contracts generally. As already noted, this is precisely what the FAA prohibits. Just as the Montana statute in *Casarotto* required that an arbitration provision contain particular language and be placed in a particular location in a contract, and hence was invalid under the FAA, so too, does section 1363.1 place restrictions on the manner in which an arbitration provision may be placed in a health care service contract.

Thus, in *Erickson v. Aetna Health Plans of California, Inc.* (1999) 71 Cal.App.4th 646 [84 Cal.Rptr.2d 76], the court held that section 1363.1 was preempted by the FAA. Citing *Casarotto*, the *Erickson* court noted that section 1363.1 "imposes on arbitration clauses in health care plans 'a special notice requirement not applicable to contracts generally,'" and such "arbitration clauses must satisfy special requirements as to form and content which are not imposed on contracts generally." (*Erickson, supra*, at p. 652.) As a result, section 1363.1 " ' "takes its meaning precisely from the fact that a contract to arbitrate is at issue . . . ," ' " and, consequently, conflicts with section 2 of the FAA." (*Erickson, supra*, at p. 652.) Therefore, PacifiCare argues, section 1363.1 is preempted by the FAA.

Plaintiffs' response to this argument is that the FAA cannot preempt section 1363.1 because of the operation of McCarran-Ferguson.

## 2. *McCarran-Ferguson*

■ Congress enacted McCarran-Ferguson in 1945.[16] It sets forth a policy declaration that it is in the public interest that the primary regulation

---

[16]McCarran-Ferguson provides:

Section 1011. "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

Section 1012. "(a) *State Regulation.* [¶] The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) *Federal Regulation.* [¶] No Act of Congress shall be construed *to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance,* or which imposes a fee or tax upon such business, *unless such Act specifically relates to the*

of the business of insurance be in the states, not in the national government. (15 U.S.C. § 1011.) It was passed in response to a United States Supreme Court decision (*United States v. South-Eastern Underwriters Assn.* (1944) 322 U.S. 533 [64 S.Ct. 1162, 88 L.Ed. 1440]), which held that the business of insurance was "commerce" within the meaning of the commerce clause and therefore the business of insurance was subject to all federal laws, including those relating to antitrust. (*Id.* at p. 553 [64 S.Ct. at pp. 1173-1174].) This was a major change in the law. In 1869, the Supreme Court had held (*Paul v. Virginia* (1868) 75 U.S. (8 Wall.) 168, 183 [19 L.Ed. 357, 361]) that insurance was not "commerce" and therefore was not subject to federal commerce clause statutes.

The clear purpose of McCarran-Ferguson was to abrogate this change and to ensure that the states would continue to enjoy broad authority in regulating the dealings between insurers and their policyholders. (*Cochran v. Paco, Inc.* (5th Cir. 1979) 606 F.2d 460, 462-463 [51 A.L.R.Fed 731].) As the Supreme Court itself later explained, "The McCarran-Ferguson Act was passed in reaction to this Court's decision in *United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533[, *supra*]. Prior to that decision, it had been assumed, in the language of the leading case, that '[i]ssuing a policy of insurance is not a transaction of commerce.' *Paul v. Virginia*, [75 U.S.] (8 Wall.) 168, 183[, *supra*]. Consequently, regulation of insurance transactions was thought to rest *exclusively* with the States. In *South-Eastern Underwriters*, this Court held that insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws, in particular, were applicable to them. Congress reacted quickly. . . . The McCarran-Ferguson Act was the product of this concern. Its purpose was stated quite clearly in its first section; Congress declared that 'the continued regulation and taxation by the several States of the business of insurance is in the public interest.' 59 Stat. 33 (1945), 15 U.S.C. § 1011. . . . [¶] . . . In context, however, it is relatively clear what problems Congress was dealing with. Under the regime of *Paul v. Virginia, supra*, States had a free hand in *regulating the dealings between insurers and their policyholders*. Their *negotiations, and the contract which resulted*, were not considered commerce and were, therefore, *left to state regulation*. The *South-Eastern Underwriters* decision threatened the continued supremacy of the States in this area. The McCarran-Ferguson Act was an attempt to turn back the clock, to assure that the *activities of insurance companies in dealing with their policyholders*

---

*business of insurance. Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended [15 U.S.C.A. 41 et seq.], *shall be applicable to the business of insurance to the extent that such business is not regulated by State law.*" (Most italics added.)

*would remain subject to state regulation.*" (*SEC v. National Securities, Inc.* (1969) 393 U.S. 453, 458-459 [89 S.Ct. 564, 567-568, 21 L.Ed.2d 668, 675-676] (*National Securities*), italics added.)

Thus, there seems little question that Congress, by its passage of McCarran-Ferguson, "returned to the states the plenary power to regulate the business of insurance that they had enjoyed prior to the *South-Eastern Underwriters* decision. If Congress intended to invoke its Commerce Clause powers to occupy part of the field of insurance regulation, it would expressly say so." (*Cochran v. Paco Inc., supra,* 606 F.2d at p. 463, fn. omitted.)[17]

The mandate of McCarran-Ferguson appears to be both plain and clear. An act of Congress may not be construed to "invalidate, impair, or supercede" a state law enacted *"for the purpose of regulating the business of insurance"* unless the federal act "specifically relates to the business of insurance." (15 U.S.C. § 1012(b), italics added.) There is no dispute between the parties that the application of the FAA would have the effect of invalidating, impairing and superseding the operation of section 1363.1; indeed, it would absolutely preclude its use to regulate the wording and organization of PacifiCare's arbitration clauses. Similarly, there is no argument that the FAA is a statute of *general application* which does *not specifically relate* to the business of insurance. Thus, in order for us to conclude that McCarran-Ferguson does preclude the application of the FAA in these consolidated cases we need only address the integrally related questions as to whether health care service plans, such as PacifiCare, are engaged in the business of insurance and whether section 1363.1 is a statute enacted "for the purpose of regulating the business of insurance."

### 3. *Health Care Service Plans Are Engaged in the Business of Insurance*

 Statutes aimed at protecting or regulating the relationship between insurer and insured, directly or indirectly, are laws regulating the "business of insurance" within the meaning of that phrase as it is used in McCarran-Ferguson. (*National Securities, supra,* 393 U.S. 453, 459-460 [89 S.Ct. 564,

---

[17]The legislative history of McCarran-Ferguson makes clear that it was Congress's intent that any law relating to interstate commerce that did not specifically relate to insurance would be subject to the provisions of McCarran-Ferguson. As one of the authors of the legislation, Senator Ferguson, put it during Senate debate, "If there is on the books of the United States a legislative act which relates to interstate commerce, if the act does not specifically relate to insurance, it would not apply at the present time. Having passed the bill now before the Senate, if Congress should tomorrow pass a law relating to interstate commerce, and should not specifically apply the law to the business of insurance, it would not be an implied repeal of this bill, and this bill would not be affected because the Congress had not . . . said that the new law specifically applied to insurance. (91 Cong. Rec. 481 (1945)." (*Cochran v. Paco, Inc., supra,* 606 F.2d at p. 463, fn. 7.)

568-569].) As the *National Securities* court emphasized, the focus of McCarran-Ferguson is upon the relationship between the insurer and its policyholders. *"The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.'* Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder." (*Id.* at p. 460 [89 S.Ct. at pp. 568-569], italics added.) "Cases interpreting the scope of the McCarran-Ferguson Act have identified three criteria relevant to determining whether a particular practice falls within that Act's reference to the 'business of insurance': *'first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.' [Citations.]" (*Metropolitan Life Ins. Co. v. Massachusetts* (1985) 471 U.S. 724, 743 [105 S.Ct. 2380, 2391, 85 L.Ed.2d 728, 742]; see also *Pilot Life Ins. Co. v. Dedeaux* (1987) 481 U.S. 41, 48-49 [107 S.Ct. 1549, 1553, 95 L.Ed.2d 39, 48].)

In *Group Life & Health Ins. Co. v. Royal Drug Co.* (1979) 440 U.S. 205, [99 S.Ct. 1067, 59 L.Ed.2d 261] (*Royal Drug*) and *Union Labor Life Ins. Co. v. Pireno* (1982) 458 U.S. 119 [102 S.Ct. 3002, 73 L.Ed.2d 647] (*Pireno*) the Supreme Court first identified these criteria. These cases, however, involved the scope of the antitrust immunity which was granted by the second clause of 15 Unied States Code section 1012(b). (See fn. 16, *ante.*)

In *Royal Drug*, independent pharmacists brought an antitrust action against Blue Shield claiming that it was engaged in price-fixing of prescription drugs. The lawsuit attacked Blue Shield's use of "Pharmacy Agreements" between it and any pharmacy in the state that wanted to participate in its program. Under the agreements, a Blue Shield insured would pay the pharmacy $2 for a prescription, and Blue Shield would reimburse the pharmacy for the actual cost of the drugs dispensed. The agreements essentially limited the participating pharmacy's profit on any prescription to $2. (*Royal Drug, supra,* 440 U.S. 205, 209 [99 S.Ct. 1067, 1072].)

The issue in *Royal Drug* was whether Blue Shield's conduct in entering into the Pharmacy Agreements was "the business of insurance" and therefore exempt from the antitrust laws. (*Royal Drug, supra,* 440 U.S. at p. 210 [99 S.Ct. at pp. 1072-1073].) The court held that the Pharmacy Agreements were not "the business of insurance" under the act.

The court first noted that "insurance" inherently involves the spreading of risk between the insurer and its insureds, and that the Pharmacy Agreements did not spread risk because they did not involve any contract between the insurer and its insured. Rather, Blue Shield assumed the risk providing its insureds with prescription drugs for $2, and the Pharmacy Agreements were simply the means of providing the promised benefit at a low cost.

In the court's view, the Pharmacy Agreements were "indistinguishable from countless other business arrangements that may be made by insurance companies to keep their costs low." (*Royal Drug, supra,* 440 U.S. at p. 215 [99 S.Ct. at p. 1075].) Because of this, and because the agreements were between the insurer and entities outside of the insurance industry, the court held that McCarran-Ferguson did not protect the practice.

In *Pireno,* a chiropractor challenged an insurer's use of a peer review panel to determine which claims for chiropractic care the insurer would pay. The insurer defended by claiming that the use of a peer review committee was exempt from the antitrust laws as part of the business of insurance. (*Pireno, supra,* 458 U.S. 119, 122 [102 S.Ct. 3002, 3005].) The court held that the use of peer review to determine whether to pay claims was not the "business of insurance" within the scope of McCarran-Ferguson, and hence not exempt from the antitrust laws.

*Pireno* distilled from *Royal Drug* the "three criteria relevant in determining whether *a particular practice* is part of the 'business of insurance' exempted from the antitrust laws by [15 United States Code section 1012(b)]." (*Pireno, supra,* 458 U.S. at p. 129 [102 S.Ct. at p. 3009], italics added.) "[F]irst, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." (*Ibid.,* italics omitted.) In *Pireno,* however, the court cautioned that, "[n]one of these criteria is necessarily determinative in itself." (*Pireno, supra,* 458 U.S. at p. 129 [102 S.Ct. at p. 3009].)

Applying the criteria to the peer review practice, the court determined that the practice did not spread risk, since the transfer of risk occurred when the policy was issued, and the peer review process was "logically and temporally unconnected to the transfer of risk." (*Pireno, supra,* 458 U.S. at p. 130 [102 S.Ct. at p. 3009].) The court also determined that peer review did not involve an integral part of the policy relationship between the insurer and its insured, nor was it limited to entities within the insurance industry, since the chiropractors performing the review were neither insureds nor within the insurance industry. (*Id.* at pp. 131-132 [102 S.Ct. at pp. 3009-3010].)

In *Department of Treasury v. Fabe* (1993) 508 U.S. 491 [113 S.Ct. 2202, 124 L.Ed.2d 449] (*Fabe*), however, the Supreme Court pointed out that both *Royal Drug* and *Pireno* were focused on the second clause of 15 United States Code section 1012(b), which related to the narrow antitrust issue rather than the broader language of the first clause. "The first clause commits laws 'enacted . . . for the *purpose of regulating* the business of insurance' to the States, while the second clause exempts only 'the business of insurance' itself *from the antitrust laws.* To equate laws 'enacted . . . for the purpose of regulating the business of insurance' with the 'business of insurance' itself, . . . would be to read words out of the statute." (*Fabe, supra,* at p. 504 [113 S.Ct. at pp. 2209-2210], italics added.)

"The broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance. [Citation.] This category necessarily encompasses more than just the 'business of insurance.' . . . [W]e believe that the actual performance of an insurance contract is an essential part of the 'business of insurance.' . . . [¶] . . . [T]he first clause of [15 United States Code section 1012(b)] was intended to further Congress' primary objective of granting the States broad regulatory authority over the business of insurance. The second clause accomplishes Congress' secondary goal, which was to carve out only a narrow exemption for 'the business of insurance' from the federal antitrust laws. [Citations.]" (*Fabe, supra,* 508 U.S. at p. 505 [113 S.Ct. at p. 2210].) Thus, "[t]here can be no doubt that the actual performance of an insurance contract falls within the 'business of insurance,' as we understood that phrase in *Pireno* and *Royal Drug.* To hold otherwise would be mere formalism. The Court's statement in *Pireno* that the 'transfer of risk from insured to insurer is effected by means of the contract between the parties . . . and . . . is complete at the time that the contract is entered' [citation], presumes that the insurance contract in fact will be enforced. Without performance of the terms of the insurance policy, there is no risk transfer at all. Moreover, performance of an insurance contract also satisfies the remaining prongs of the *Pireno* test: It is central to the policy relationship between insurer and insured and is confined entirely to entities within the insurance industry." (*Fabe, supra,* 508 U.S. at pp. 503-504 [113 S.Ct. at p. 2209].)[18]

▉ As we pointed out earlier, HMO's or health care service plans, such as PacifiCare, are engaged in providing a service that is a substitute for what previously constituted health *insurance.* "The only distinction between an

---

[18]Moreover, as we explain in the next section, the so-called *Pireno* factors are merely "considerations" to be weighed rather than essential criteria and, even if they were essential, they have been met in this case.

HMO . . . and a traditional insurer is that the HMO provides medical services directly, while a traditional insurer does so indirectly by paying for the service [citation], but this is a distinction without a difference. [Citations.] In the end, HMOs function the same way as a traditional health insurer. The policyholder pays a fee for a promise of medical services in the event that he should need them. It follows that HMOs . . . are in the business of insurance." (*Washington Physicians Service Ass'n v. Gregoire* (9th Cir. 1998) 147 F.3d 1039, 1045-1046.) Other courts have also reached the conclusion that HMO's *are engaged in the business of insurance.* (*Kentucky Assoc. of Health Plans, Inc. v. Nichols* (6th Cir. 2000) 227 F.3d 352, 364; *Corporate Health Ins., Inc. v. Texas Dept. of Ins.* (5th Cir. 2000) 215 F.3d 526, 538; *Anderson v. Humana, Inc.* (7th Cir. 1994) 24 F.3d 889, 892; *Ocean State Physicians Health Plan v. Blue Cross* (1st Cir. 1989) 883 F.2d 1101, 1107-1108.) We believe the reasoning of these cases is sound and we have no trouble also concluding that PacifiCare, as a health care service plan (or HMO), is engaged in the business of insurance.

Significantly, the Legislature has reached the same conclusion in a very public way. It has *expressly* recognized that health care service plans in California *are engaged in the business of insurance within the meaning of the McCarran-Ferguson Act.* In 1999, it enacted the Managed Health Care Insurance Accountability Act of 1999, Statutes 1999, chapter 536 (Sen. Bill No. 21) section 2, partially codified at Civil Code section 3428. This statute provides a nonexclusive state-law-based remedy for injuries caused by the failure of managed care entities and health care service plans to provide medically appropriate treatment to their subscribers. In an uncodified section 2 to the act, the Legislature stated: "SEC. 2. (a) The Legislature finds and declares as follows:

"(1) Based on the fundamental nature of the relationships involved, a health care service plan and all other managed care entities regulated under the Health and Safety Code *are engaged in the business of insurance in this state as that term is defined for purposes of the McCarran-Ferguson Act* (15 U.S.C. Sec. 1011 and following). Nothing in this act shall be construed to impose the regulatory requirements of the Insurance Code on health care service plans regulated by the Health and Safety Code." (Italics added.)

The case on which PacifiCare relies (*Williams v. California Physicians' Service, supra,* 72 Cal.App.4th 722) is not to the contrary. Indeed, it did not even address the issue before us. *Williams* simply held that a health care service plan regulated by the Knox-Keene Act was not necessarily the equivalent to an insurance company *for regulatory purposes. Williams* did not purport to address the issue confronting this court. *Rather, it simply*

*recognized that the Legislature has elected to subject insurers and health care service plans to distinct regulatory regimes.* Insurers are regulated by the Insurance Code and the Insurance Commissioner. Health care service plans fall under the jurisdiction of the Department of Managed Care and the Knox-Keene Act. Hence, when the plaintiff in *Williams* sought to challenge the conduct of her health care service plan by invoking a provision of the Insurance Code, the court correctly held that the statute did not apply. Nothing in the reasoning or holding of *Williams* justifies PacifiCare's contention that somehow it is not engaged in the business of insurance.

This leaves us with the final and critical question. Does section 1363.1 constitute a regulation of that insurance business.

### 4. *Section 1363.1 Does Regulate the Business of Insurance*

The Supreme Court has recently made it clear that the so-called *Pireno* factors are merely " '*considerations* [to be] weighed' in determining whether a state law regulates insurance, [Citation], and that '[n]one of these criteria is necessarily determinative.' " (*UNUM Life Ins. Co. of America v. Ward* (1999) 526 U.S. 358, 373 [119 S.Ct. 1380, 1389, 143 L.Ed.2d 462, 476] (*Ward*).) Although it was considering the issue in the context of the "savings clause" of the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. §§ 1001, 1144(b)(2)(A)), the court's reasoning is obviously relevant here. The court repeated the comment made in an earlier decision where it noted that the *first question* to be addressed was whether the state law " '*fit a common-sense understanding of insurance* regulation' " and *then* the *Pireno* factors would be looked to as "*checking points* or '*guideposts, not separate essential elements . . . that must each be satisfied*' to save the State's law." (*Ward, supra,* at p. 374 [119 S.Ct. at p. 1389], italics added.)

 In order to be within the commonsense definition of insurance regulation, "a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry." (*Pilot Life Ins. Co. v. Dedeaux, supra,* 481 U.S. 41, 50 [107 S.Ct. 1549, 1554].) Section 1363.1 falls squarely within the standard announced in *National Securities, supra,* 393 U.S. 453. It regulates the language and terms of the policies that HMO's can offer in California, by requiring HMO's that want to use mandatory arbitration to provide certain disclosures in the documents issued to its plan enrollees. Because it defines the language that HMO's must use in their plan documents, section 1363.1 operates directly on the relationship between the HMO and its insured/enrollee. The disclosure requirement is plainly an effort to protect insureds, hence the state has exercised its power to protect or regulate the relationship between the HMO and its members. This is

exactly what *National Securities* says falls within the "core" of the business of insurance. (*National Securities, supra,* at p. 460 [89 S.Ct. at pp. 568-569].)

Nothing in *Fabe* limits the test announced in *National Securities.* To the contrary, *Fabe* reaffirmed that test, holding that the Ohio law involved in that case fell within scope of McCarran-Ferguson because it was " 'aimed at protecting or regulating' the *performance of an insurance contract.*" (*Fabe, supra,* 508 U.S. at p. 505 [113 S.Ct. at p. 2210], italics added.) The *Fabe* court rejected the Federal Government's contention that *Royal Drug* and *Pireno* had somehow supplanted the *National Securities* test, distinguishing those cases, and noting that they did not address the first clause of section 2(b) of McCarran-Ferguson (i.e., 15 U.S.C. § 1012(b)) relating to state laws *enacted for the purpose of regulating* the business of insurance, but rather focused on the second clause dealing with the narrower question of the antitrust exemption. (*Fabe, supra,* at pp. 502-504 [113 S.Ct. at pp. 2208-2210].)

Three federal appellate courts have concluded that state laws that restrict arbitration in the context of insurance are "state laws enacted for the purpose of regulating the business of insurance." (*Mutual Reinsurance Bureau v. Great Plains Mut.* (10th Cir. 1992) 969 F.2d 931, cert. den. (1992) 506 U.S. 1001 [113 S.Ct. 604, 121 L.Ed.2d 540]; *Stephens v. American Intern. Ins. Co.* (2d Cir. 1995) 66 F.3d 41, 43-45; and *Quackenbush v. Allstate Ins. Co.* (9th Cir. 1997) 121 F.3d 1372, 1381.) In *Mutual Reinsurance,* (which predated *Fabe*) the Tenth Circuit Court of Appeals held that a Kansas law prohibiting arbitration clauses in insurance policies was not preempted by the Federal Arbitration Act, because it was a state law that regulated insurance. (*Mutual Reinsurance, supra,* 969 F.2d at p. 933.) The *Mutual Reinsurance* court relied primarily on *National Securities,* explaining that the Kansas statute regulated the relationship between the insured and the policyholder, and was therefore at the core of the business of insurance.

The Second Circuit Court of Appeals reached the same conclusion in *Stephens,* holding that Kentucky's legislative scheme for liquidating failed insurance companies, which contained an anti-arbitration provision, was protected by McCarran-Ferguson. The court also relied on *National Securities* and *Fabe,* concluding that the statute in question was part of a state liquidation scheme that regulated the performance of insurance policies once an insurer (or reinsurer) is placed in liquidation. (*Stephens, supra,* 66 F.3d at p. 44.)

The Ninth Circuit's discussion of the issue in *Quackenbush* is admittedly dictum because the court explained that, unlike the Kentucky liquidation

scheme, California's liquidation scheme lacked an anti-arbitration provision. (*Quackenbush v. Allstate Ins. Co., supra,* 121 F.3d at p. 1381.) But the court was clear that, "if a California law prohibited arbitration of disputes involving an insolvent insurer, then that law would undoubtedly also be saved [by McCarran-Ferguson] from preemption by the FAA." (*Ibid.*)

Even accepting the contention, however, that the issue should be decided by application of the *Pireno* factors, we believe that the facts and circumstances presented here demonstrate that those criteria, as recently characterized and applied by the Supreme Court in *Ward, supra,* 526 U.S. 358, are in fact sufficiently met. It is true that section 1363.1 does not transfer risk. Plaintiffs concede the point, but argue that the issue is irrelevant. *Ward* makes it clear that even if the *Pireno* test is applied, *not all three parts must be met.* PacifiCare contends that the second prong is also not met because section 1363.1 regulates arbitration provisions, which, PacifiCare argues, are not an integral part of the policy relationship between the insurer and the insured. PacifiCare contends that arbitration is really nothing more than a shift in forum, leaving a party's substantive rights under the policy unchanged. *Ward,* however, does not justify this argument. There, UNUM argued that the notice-prejudice rule "regulates only the administration of insurance policies, not their substantive terms [and] it [therefore] cannot be an integral part of the policy relationship." (*Ward, supra,* 526 U.S. at p. 375, fn. 5 [119 S.Ct. at p. 1390].) The *Ward* court expressly rejected this argument. (*Ibid.*) Here, because section 1363.1 directly regulates the words that PacifiCare may use in its plan if it wants to include an enforceable arbitration clause, it regulates an integral part of the policy relationship. This relates directly to the *performance and enforcement* of the policy, a factor of critical importance under *Fabe.*[19]

PacifiCare finally contends that the third prong is not satisfied. It argues that because section 1363.1 affects health care service plans, and not insurance companies, the statute is not limited to insurance entities. We have

---

[19]Citing *Fabe,* the court in *Standard Sec. Life Ins. Co. of New York v. West* (8th Cir. 2001) 267 F.3d 821 held that a Missouri statute providing that arbitration provisions are "valid, enforceable and irrevocable," "except [in] *contracts of insurance* and contracts of adhesion" (italics added), was *not* preempted by the FAA because of the application of McCarran-Ferguson. Like here, there was no dispute that (1) the FAA did not specifically relate to the business of insurance and (2) its application would "invalidate, impair, or supersede" the Missouri statute. The question in *Standard Sec. Life* was whether the statute had been enacted to regulate the "business of insurance." (*Id.* at p. 823.) The court held that it was enacted for such purpose "because it applies to the processing of disputed claims. This processing, in turn, has a substantial effect upon the insurer-insured relationship and the policy's interpretation and enforcement, both of which are 'core' components of the business of insurance. [Citations.]" (*Ibid.*) Several other courts have reached the same result on similar reasoning. (See, e.g., *Davister Corp. v. United Republic Life Ins. Co.* (10th Cir. 1998) 152 F.3d 1277, 1279-1282; *Munich American Reinsurance Co. v. Crawford* (5th Cir. 1998) 141 F.3d 585, 590-594.)

already disposed of this contention. HMO's *are* engaged in the business of insurance when they offer health coverage to their members, and section 1363.1 clearly regulates this aspect of their endeavor. The fact that they are also involved in other activities that may not constitute the business of insurance is of no consequence to the issue before us.

Health and Safety Code section 1363.1 is limited solely to HMO's, and parallels Insurance Code section 10123.19, which requires disability insurers (which includes health insurers) who wish to include arbitration clauses in their policies to make the same disclosures to their insureds. These provisions, which were simply different sections of the same legislation, evidence an effort by the Legislature to regulate the relationship between insureds and their insurers, *regardless of the type of coverage being provided.*

Ultimately, therefore, even if the *Pireno* test is to be applied, section 1363.1 meets that test as clarified and applied in *Ward.* Finally, as a simple matter of common sense, by conditioning the availability of arbitration in HMO subscriber contracts on the HMO's' compliance with the mandated disclosures, section 1363.1 regulates insurance.

## CONCLUSION

For all of the foregoing reasons, we conclude that PacifiCare is engaged in the business of insurance and section 1363.1 clearly purports to regulate an important aspect of that business relating to the performance and enforcement of the policy. Thus, section 1363.1 does regulate the business of insurance within the meaning of McCarran-Ferguson. Therefore, the FAA, a federal statute of general application, which does not "specifically relate" to insurance, is foreclosed from application to prevent the operation of section 1363.1. As a result, PacifiCare's arbitration provisions may not be enforced because of their failure to satisfy the specific and unambiguous disclosure requirements imposed by section 1363.1. The trial court erred in granting PacifiCare's petition to compel arbitration in the Rivera case and properly denied a similar petition in the Smith matter.

## DISPOSITION

The order in Smith (case No. B142321) is affirmed. In the Rivera writ proceeding (case No. B145004), the order to show cause is discharged and a peremptory writ shall issue directing the trial court to vacate its order of August 15, 2000, granting PacifiCare's petition to compel arbitration and to enter a new and different order denying such petition. Upon remand, the trial court shall conduct such further proceedings as are appropriate in each case

and are consistent with the views expressed herein. Both Smith and Rivera shall recover their costs incurred in these appellate proceedings.

Klein, P. J., and Aldrich, J., concurred.

The petitions of appellants and real party in interest for review by the Supreme Court were denied February 20, 2002.