[No. B159156. Second Dist., Div. Seven. Oct. 15, 2002.]

TERI PAGARIGAN et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
AETNA U.S. HEALTHCARE OF CALIFORNIA, INC., et al., Real
Parties in Interest.

## COUNSEL

Carol S. Jimenez; Houck & Balisok, Russell S. Balisok, Steven C. Wilheim and Patricia L. Canner for Petitioners.

No appearance for Respondent.

Gibson, Dunn & Crutcher, Kirk A. Patrick, Antoinette D. Paglia and Louis E. Shoch III for Real Parties in Interest.

## OPINION

**WOODS, J.—**

### SUMMARY

This writ petition presents the question whether a Medicare health care service plan may enforce a plan arbitration provision although that provision does not comply with statutory disclosure requirements applicable to all health care service plan arbitration agreements under California law. The petitioner seeks a writ of mandate vacating the trial court's order granting the Medicare plan's petition to compel arbitration. Because we agree with the petitioner that neither the Federal Arbitration Act nor federal Medicare provisions preempt California's mandatory disclosure requirements, we grant the writ petition.

### FACTUAL AND PROCEDURAL SYNOPSIS

In 1995, Johnnie Pagarigan enrolled in a Medicare HMO plan offered by Aetna U.S. Healthcare of California, Inc. Pursuant to a contract with the Health Care Financing Administration (HCFA), the federal entity that administers the Medicare program, Aetna offered replacement Medicare coverage to Medicare beneficiaries such as Pagarigan under the Senior Choice plan (later renamed the Golden Medicare plan).

Under Health and Safety Code section 1363.1 (in effect at the time of Pagarigan's enrollment to the present), any health care service plan that

requires binding arbitration to settle disputes must provide a disclosure meeting certain specified conditions. (All statutory references are to the Health and Safety Code unless otherwise indicated.) More particularly, the statutorily mandated disclosure language "shall be prominently displayed on the enrollment form signed by each . . . enrollee" and shall appear "immediately before the signature line provided for the individual enrolling in the health care service plan." (§ 1363.1.) The Aetna enrollment form Pagarigan signed did not include any mention of arbitration.

Each year of Pagarigan's enrollment, Aetna published a new "Evidence of Coverage" (EOC), setting forth Aetna's agreement with its members. The 1995 member handbook and EOC included something of an arbitration provision, but, in 1996, Aetna made a "business decision" to delete that provision from the EOC's for 1996 through 1999.[1] Aetna later decided to reinsert an arbitration provision in the 2000 EOC.[2] The provision appeared as an unpaginated amendment located about 75 pages into a document of

---

[1]After explaining the procedure for filing a grievance, the 1995 provision (found at p. 16 of the handbook and EOC) read as follows: "If you are not satisfied with the [grievance panel's] proposed resolution, you *may* request binding arbitration. [¶] *If You Want* to Have Binding Arbitration [¶] *Any differences* between you and the Health Plan (*other than those subject to the Medicare Appeals Procedure*) are *subject to* binding arbitration." (Italics added.)

[2]As stated in the amendment to the 2000 EOC, the provision read: "AETNA U.S. HEALTHCARE OF CALIFORNIA, INC. [¶] MEDICARE EVIDENCE OF COVERAGE AMENDMENT [¶] The Aetna . . . Golden Medicare Plan Evidence of Coverage is hereby amended to add the following: [¶] GRIEVANCE AND FEDERAL MEDICARE APPEAL PROCEDURE [¶] The Grievance and Federal Medicare Appeal Procedure Section of this [EOC] is hereby amended to add the following to the HMO Inquiry and Grievance Procedure Part A 'Inquiry and Grievance Procedures': [¶] Binding Arbitration [¶] Binding arbitration is the final and exclusive process for resolving any dispute between the Member and the HMO (other than those brought under the Medicare Appeals Procedure). The agreement to arbitrate includes (but is not limited to) bad faith claims and disputes that relate to professional liability or medical malpractice. The member is giving up the constitutional right to have their claim or dispute decided in a court of law before a jury, and instead is accepting the use of binding arbitration. This means that the Member will not be able to try their case in court. [¶] Unless the parties otherwise agree, all claims or disputes shall be submitted to neutral arbitration by one arbitrator within the HMO Service Area. The Health Care Claims Settlement Procedures of the American Arbitration Association (AAA) will govern any arbitration proceedings. The AAA can be reached by calling [specified telephone numbers in Los Angeles, San Francisco and San Diego]. The parties will equally share in the payment of fees and expenses of the arbitrator and any administrative fees. In cases of extreme hardship to a Member, the arbitrator may allocate all or a portion of the Member's share of the arbitrator's fees and expenses to HMO. For more information regarding this arbitration process, please call the HMO member services phone number located on the Member's ID card. [¶] The arbitrator's decision is final and each party is bound to comply with the decision. This arbitration provision is subject to enforcement and interpretation under the Federal Arbitration Act. [¶] Limitations [¶] 1. No Jury Trial. In any dispute between the Member and HMO (other than those brought under the Medicare Appeals Procedure) the Member shall have no right to a jury trial. The Member expressly waives the right to trial by a jury. [¶] 2. Medical Injury Compensation Reform

more than 100 pages (the EOC itself with pages numbered to 68 with a corresponding table of contents, followed by numerous unpaginated or separately-paginated amendments with no directory).

Pagarigan died in June 2000. Thereafter, her adult children (Teri Pagarigan, Mary Pagarigan and John Pagarigan) filed suit against Aetna (and a number of codefendants not involved in this writ proceeding), alleging that Pagarigan was denied timely and proper treatment for her condition.[3] They asserted causes of action for negligence, willful misconduct, intentional infliction of emotional distress, elder abuse, tort per se (based on statutory violations of Pen. Code, § 368 and Welf. & Inst. Code, § 15656, which prohibit willfully subjecting elders to unjustifiable pain and suffering), constructive fraud, various additional fraud claims and wrongful death, arising out of the medical care Pagarigan received from February 23, 2000, until her death.[4]

In May 2001, Aetna filed a petition to compel arbitration based on the arbitration provision approved by the HCFA for the 2000 EOC, arguing that *Erickson v. Aetna Health Plans of California, Inc.* (1999) 71 Cal.App.4th 646

---

Act. In any case where the **Member** asserts a claim of professional liability or medical malpractice against a **Participating Provider** or **HMO**, the damage limits provided by the California Medical Injury Compensation Reform Act shall apply. The ability to obtain an order for periodic payments under California Code of Civil Procedure Section 667.7 shall be available in arbitration in the same manner as if the dispute had been tried in court. [¶] **3. Class Actions.** No **Member** may participate in a representative capacity or as a member of any class of claimants in any proceeding related to **HMO** coverage. Claims brought by any **Member** (including his/her covered dependents) may not be joined or consolidated with claims brought by any other **Member(s)** unless otherwise agreed to in writing by **HMO**. The **Member** expressly waives any right to participate in a class or in a representative capacity, or to join or consolidate claims with other parties."

[3] Actually, they sued both Aetna U.S. Healthcare of California, Inc. (the entity with which Pagarigan contracted), and its parent company, Aetna, Inc. Because the trial court's rulings treated the two corporations as one for purposes of the petition to compel arbitration (and the preemption analysis applies equally to both), our subsequent references to Aetna include both entities.

[4] According to the operative complaint, Pagarigan was admitted to a "long-term care" facility in February 2000 under her Aetna plan. While in the care of this facility and the health care providers with whom Aetna had contracted, Pagarigan developed a large, "particularly severe pressure sore on her lower back . . . , lost significant weight, became malnourished, dehydrated, and developed a severe infection at the site of her G-Tube inserted in her abdomen." These problems were not promptly assessed, Pagarigan's family members were not informed as to her condition and, when the need for acute care was recognized, Aetna (and its codefendants) "still failed to arrange for [Pagarigan's] transfer to a hospital where she could obtain more (and more expensive) care." "[F]inancial motivation was the incentive." As a result, Pagarigan died. There are further allegations regarding statutory violations, multiple misrepresentations and fraud.

[84 Cal.Rptr.2d 76] (*Erickson*), was "dispositive" of the issue.[5] After determining that section 1363.1 and its mandatory disclosure requirements were preempted by the Federal Arbitration Act (FAA), the *Erickson* court enforced Aetna's arbitration provision in the 1995 version of the same plan in which Pagarigan had enrolled. (*Erickson, supra,* 71 Cal.App.4th at pp. 649, 652.) Over opposition from Pagarigan's children, the trial court granted Aetna's petition in September, concluding (among other things) that the "agreement to arbitrate is governed by federal law, specifically the . . . FAA[ ] and thus state law requirements with respect to the form and substance of arbitration provisions are preempted (*see Erickson*[, *supra,*] 71 Cal.App.4th [at p.] 651)."

Pagarigan's children later moved for reconsideration of the court's arbitration order, asserting that Division Three's decision in *Smith v. PacifiCare Behavioral Health of Cal., Inc.* (2001) 93 Cal.App.4th 139 [113 Cal.Rptr.2d 140] (*Smith*) (rendered after the arbitration order) "constituted a change in the law." The *Smith* court held that section 1363.1 is *not* preempted by the FAA because of federal legislation the *Erickson* court did not consider (the McCarran-Ferguson Act). (*Smith, supra,* 93 Cal.App.4th at p. 162.) After awaiting finality of the *Smith* decision, the trial court granted reconsideration but again ordered arbitration, including the following findings in its May 2002 order:

" The health plan before the Court is a Medicare health plan[,] specifically a Medicare+Choice health plan entitled the Aetna U.S. Health Care Golden Medicare Plan, formerly known as the Senior Choice Plan.

". . . Smith[, *supra,* 93 Cal.App.4th 139] did not consider a Medicare health plan.

". . . Erickson[, *supra,* 71 Cal.App.4th 646] did uphold federal preemption with respect to a Medicare health plan.

". . . Federal regulation of the Medicare program, including Medicare health plans, is extensive.

". . . Based on federal law and Erickson, [*supra,* 71 Cal.App.4th 646], Smith[, *supra,* 93 Cal.App.4th 139] is distinguishable and provides no basis for disturbing the Court's prior Order granting [Aetna's] Petition."

---

[5]According to a declaration submitted in support of the petition, Pagarigan was given a member handbook and EOC at the time of her enrollment "like other . . . plan enrollees," and Aetna "periodically sent [her] (as well as other Senior Choice/Golden Medicare Plan members) updated EOC[']s . . . ."

In June, Pagarigan's children filed this writ petition, arguing (among other things) that Aetna cannot enforce its arbitration provision because it failed to comply with section 1363.1, a provision they say is not preempted by either the FAA or the Medicare scheme. After receiving Aetna's preliminary opposition, we issued an order to show cause why the trial court should not be compelled to vacate its order granting Aetna's petition to compel arbitration and to issue an order denying that petition instead. In response, Aetna filed its return, urging that the trial court correctly concluded that "under both *Erickson* and *Smith*, under both the Federal Arbitration Act and the McCarran-Ferguson Act, arbitration must be compelled and all state laws applicable to arbitration provisions are preempted." Pagarigan's children filed a reply.

DISCUSSION

■■■ As noted, Pagarigan's children contend that section 1363.1 is not preempted by either the FAA or Medicare and therefore Aetna cannot enforce its arbitration provision because it does not comply with this state's mandatory disclosure requirements under section 1363.1. In Aetna's view, even if the FAA does not preempt state law requirements applicable to arbitration provisions in *non*-Medicare health care service plans under *Smith*, "such state laws are nonetheless preempted here under the McCarran-Ferguson Act by the pervasive federal regulatory scheme governing the Medicare program and the Medicare+Choice health care service plans." The law of preemption supports Pagarigan's children, not Aetna.

I. *General Preemption Principles.*

■■■ " 'It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed.' " (*New York Dept. of Social Services v. Dublino* (1973) 413 U.S. 405, 413 [93 S.Ct. 2507, 2513, 37 L.Ed.2d 688]; *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [116 S.Ct. 2240, 2250, 135 L.Ed.2d 700] (*Medtronic*); *Fidelity Federal Sav. & Loan Assn. v. De la Cuesta* (1982) 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664].) Where (as here) Congress regulates a field historically within the police powers of the states (public health), we proceed from the assumption that state law is *not* superseded unless there is a "clear and manifest purpose of Congress" to foreclose a particular field to state legislation.[6] (*Medtronic, supra,* 518 U.S. at p. 485 [116 S.Ct. at p. 2250]; *Pacific Gas & Elec. v. Energy Resources*

---

[6]The " ' "historic police powers of the States" ' " extend to consumer protection" as well. (*Smiley v. Citibank* (1995) 11 Cal.4th 138, 148 [44 Cal.Rptr.2d 441, 900 P.2d 690].)

*Comm'n* (1983) 461 U.S. 190, 206 [103 S.Ct. 1713, 1723, 75 L.Ed.2d 752]; *McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 422 [106 Cal.Rptr.2d 271, 21 P.3d 1189] (*McCall*) ["We presume that in enacting laws, Congress does not intend to preempt state regulation of the same subject matter unless a contrary intent is made clear"]; *Smiley v. Citibank, supra,* 11 Cal.4th at p. 148; *Solorzano v. Superior Court* (1992) 10 Cal.App.4th 1135, 1139 [13 Cal.Rptr.2d 161] (*Solorzano*).)

■ Preemption may be either express or implied. "[W]hen Congress has 'unmistakably . . . ordained,' [citation] that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall." (*Jones v. Rath Packing Co.* (1977) 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604].) In the absence of explicit preemptive language, the Supreme Court has recognized two types of implied preemption: "field pre-emption, where the scheme of federal regulation is ' "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," ' [citation], and conflict pre-emption, where 'compliance with both federal and state regulations is a physical impossibility,' [citation], or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' [citations]." (*Gade v. National Solid Wastes Management Assn.* (1992) 505 U.S. 88, 98 [112 S.Ct. 2374, 2383, 120 L.Ed.2d 73] (*Gade*).)

II. *Section 1363.1, Erickson, Smith and Other Undisputed Matters.*

■ Section 1363.1 provides: "Any health care service plan that includes terms that require binding arbitration to settle disputes and that restrict, or provide for a waiver of, the right to a jury trial *shall include,* in clear and understandable language, *a disclosure that meets all of the following conditions*:

"(a) The disclosure shall clearly state whether the plan uses binding arbitration to settle disputes, including specifically whether the plan uses binding arbitration to settle claims of medical malpractice.

"(b) *The disclosure* shall appear as a separate article in the agreement issued to the employer group or individual subscriber and *shall be prominently displayed on the enrollment form signed by each subscriber or enrollee.*

"(c) The disclosure shall clearly state whether the subscriber or enrollee is waiving his or her right to a jury trial for medical malpractice, other disputes relating to the delivery of service under the plan, or both, and *shall be substantially expressed in the wording provided in subdivision (a) of Section 1295 of the Code of Civil Procedure.*

"(d) In any contract or enrollment agreement for a health care service plan, *the disclosure required by this section shall be displayed* immediately before the signature line provided for the representative of the group contracting with a health care service plan and *immediately before the signature line provided for the individual enrolling in the health care service plan.*" (Underscoring and italics added.)

The reference to subdivision (a) of Code of Civil Procedure section 1295 means that the disclosure mandated by section 1363.1 is to be "substantially expressed" as follows: " 'It is understood that any dispute as to medical malpractice, *that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered,* will be determined by submission to arbitration *as provided by California law,* and not by a lawsuit or resort to court process *except as California law provides for judicial review of arbitration proceedings. Both parties* to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.' " (Underscoring and italics added.)

There is no dispute that the enrollment form Pagarigan signed made no mention whatsoever of arbitration, let alone a disclosure satisfying all of the foregoing requirements of section 1363.1. The question is whether section 1363.1 applies or is preempted in this case. Aetna argues that *Erickson* (finding preemption under the FAA) controls and *Smith* (finding no FAA preemption under the McCarran-Ferguson Act) is inapplicable because *Erickson* involved a Medicare plan and *Smith* did not. Accordingly, we must first discuss what these cases did (and did not) determine.

The *Erickson* court analyzed the issue of whether section 1363.1 was preempted by the FAA in the following manner. The FAA (9 U.S.C. § 1 et seq.) applies to any "contract evidencing a transaction involving commerce" which contains an arbitration clause. (9 U.S.C. § 2.) Section 2 of the FAA further provides that arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (*Erickson, supra,* 71 Cal.App.4th at p. 650.)

In *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687 [116 S.Ct. 1652, 1656, 134 L.Ed.2d 902] (*Casarotto*), the United States Supreme Court held that the FAA preempted a Montana statute that required an arbitration clause to be typed in underlined capital letters on the first page of a contract to be enforceable. (*Erickson, supra,* 71 Cal.App.4th at pp. 651-652.) Stating that section 2 of the FAA precluded states from " 'singling out

arbitration provisions for suspect status,' " the Supreme Court in *Casarotto* found the Montana law in direct conflict with section 2 because it conditioned the enforceability of an arbitration agreement " 'on compliance with a special notice requirement not applicable to contracts generally.' " (*Erickson*, at p. 652.)

Citing *Casarotto*, the *Erickson* court concluded that section 1363.1 similarly conflicted with section 2 of the FAA because it too imposes on health care plan arbitration clauses " 'a special notice requirement not applicable to contracts generally.' " (*Erickson*, *supra*, 71 Cal.App.4th at p. 652.) Although the plan at issue was a Medicare plan, the *Erickson* court made mention of this fact in its preemption analysis for the sole purpose of assessing whether the contract at issue involved interstate commerce as required for the FAA to apply.[7] (*Erickson*, at p. 651.) There was no discussion whatsoever of whether section 1363.1 was independently preempted under the Medicare scheme.[8]

In *Smith*, *supra*, 93 Cal.App.4th 139, another health care plan (PacifiCare) sought to compel arbitration, asserting FAA preemption of section 1363.1 under *Erickson* (just as Aetna urges here). The difference in *Smith*, however, was that the plaintiffs responded with an argument never considered in *Erickson*. They asserted that the FAA *could not* preempt section 1363.1 because the McCarran-Ferguson Act foreclosed application of the FAA. (93 Cal.App.4th at p. 152.)

After reviewing the analysis under *Erickson*, Division Three turned to the McCarran-Ferguson Act, enacted by Congress in 1945, which "sets forth a policy declaration that *it is in the public interest that the primary regulation of*

---

[7]Here, as in *Erickson*, there is no dispute that the Medicare contract at issue involves interstate commerce. According to a supporting declaration submitted by Aetna's western region Medicare compliance director, the Golden Medicare plan (formerly Senior Choice) covers benefits offered under Medicare parts A and B plus additional coverage as outlined in the EOC and operates pursuant to a contract with the federal government. Plan coverage is available only to Medicare beneficiaries, who pay monthly premiums through Social Security deductions or payments to Medicare. In providing services under the Medicare contract, Aetna contracts with vendors and service providers operating on a national basis. (*Erickson*, *supra*, 71 Cal.App.4th at p. 651 ["In an analogous context, it has been held that a health care provider's treatment of Medicare patients, receipt of reimbursement from Medicare, and purchase of out-of-state medicines and supplies constitutes being engaged in interstate commerce for purposes of the Sherman Act"]; *Smith*, *supra*, 93 Cal.App.4th at pp. 151-152.)

[8]The plaintiff in *Erickson* also argued that the contract was adhesive and could not be enforced absent a showing he had been made aware of the provision, that the language was too misleading to be valid and that his mistaken interpretation of the provision prevented mutual assent. The court acknowledged that the language of the arbitration provision "could have been clearer" and that it might well construe the provision's uncertainty against Aetna under state law, but said that because the FAA controlled, it had to reject these arguments. (*Erickson*, *supra*, 71 Cal.App.4th at pp. 652-659.)

*the business of insurance be in the states, not in the national government.*[9] (15 U.S.C. § 1011.) It was passed in response to a United States Supreme Court decision (*United States v. South-Eastern Underwriters Assn.* (1944) 322 U.S. 533 [64 S.Ct. 1162, 88 L.Ed. 1440]), which held that the business of insurance was 'commerce' within the meaning of the commerce clause and therefore the business of insurance was subject to all federal laws, including those relating to antitrust. (*Id.* at p. 553 [64 S.Ct. at pp. 1173-1174].) This was a major change in the law. In 1869, the Supreme Court had held (*Paul v. Virginia* (1868) 75 U.S. (8 Wall.) 168, 183 [19 L.Ed. 357, 361]) that insurance was not 'commerce' and therefore was not subject to federal commerce clause statutes." (*Smith, supra,* 93 Cal.App.4th at pp. 152-153, italics added.)

"The clear purpose of McCarran-Ferguson was to abrogate this change and to ensure that the states would continue to enjoy broad authority in regulating the dealings between insurers and their policyholders. . . ." (*Smith, supra,* 93 Cal.App.4th at p. 153, citation omitted.) "The mandate of McCarran-Ferguson appears to be both plain and clear. An act of Congress may not be construed to 'invalidate, impair, or supersede' a state law enacted '*for the purpose of regulating the business of insurance*' unless the federal act 'specifically relates to the business of insurance.'" (*Id.* at p. 154, citing 15 U.S.C. § 1012(b) and adding italics.) Noting that there was no dispute that application of the FAA would supersede the application of section 1363.1 nor any dispute that the FAA is a statute of *general application* that does *not specifically relate* to the business of insurance, the *Smith* court turned to examine the "integrally related questions as to whether health care service plans . . . are engaged in the business of insurance and whether section 1363.1 is a statute enacted 'for the purpose of regulating the business of insurance.'" (*Smith, supra,* 93 Cal.App.4th at p. 154.)

After carefully examining both factors, Division Three determined that health care service plans "*are* engaged in the business of insurance when

---

[9]As the *Smith* court noted, pursuant to the McCarran-Ferguson Act, "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." (15 U.S.C. § 1011.) The next section provides: "(a) *State Regulation.* [¶] The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business. [¶] (b) *Federal Regulation.* [¶] No Act of Congress shall be construed *to invalidate, impair, or supersede* any law *enacted by any State for the purpose of regulating the business of insurance,* or which imposes a fee or tax upon such business, *unless such Act specifically relates to the business of insurance:* Provided, That . . . [the Sherman, Clayton and Federal Trade Commission Acts] shall be applicable to the business of insurance to the extent that such business is not regulated by State law." (15 U.S.C. § 1012, italics added, original italics omitted; *Smith, supra,* 93 Cal.App.4th at pp. 152-153, fn. 16.)

they offer health coverage to their members, and section 1363.1 clearly regulates this aspect of their endeavor." (*Smith, supra,* 93 Cal.App.4th at p. 162.) The court concluded "[t]herefore, [that] the FAA, a federal statute of general application, which does not 'specifically relate' to insurance, is foreclosed from application to prevent the operation of section 1363.1." (*Ibid.*) As a result, PacifiCare's arbitration provision could not be enforced for its failure to satisfy the "specific and unambiguous disclosure requirements imposed by section 1363.1." (*Ibid.*)

III. *Section 1363.1 Is Not Preempted by the FAA.*

"In [*Smith*]," Aetna says, "the court explained that the 'clear purpose of the McCarran-Ferguson Act . . . [is] to insure that the states would continue to enjoy broad authority in regulating the dealings between insurers and their policyholders.' [(*Smith, supra,*] 93 Cal.App.4th at [p.] 153.)] Here, however, the 'dealings' are not between an insurer and its policyholder, but rather, between Medicare (the federal government) and Medicare beneficiaries through the intermediary of Medicare health care service plans contracted with the federal government to provide Medicare benefits.[10] Neither [*Smith*] nor the cases on which it relies, address the intensive federal regulation of the Medicare program, itself a creature of federal statute, or the preemption of state regulation over Medicare health care service plans.

"Consequently, *the McCarran-Ferguson Act had no application in [Erickson], and has no application here, because there is in place a specifically related and all encompassing federal regulatory scheme governing the Medicare program and its contracted Medicare health care service plans, <u>including federal supervision over the form and substance of arbitration provisions.</u>* See 42 C.F.R. § 422.80 . . . . Thus, [*Erickson*], upon which [the trial court] relied in granting [Aetna's] petition to compel arbitration, is still

---

[10]It appears that Aetna is simply arguing that the McCarran-Ferguson Act does not apply to Medicare, a point we address in part IV, *post.* To the extent this argument can be construed as an attempt to somehow argue that *Medicare* health care service plans are not engaged in the business of insurance in an effort to distinguish *Smith*'s FAA analysis, *supra,* 93 Cal.App.4th at pages 154 to 159, we note that health care service plans, including *Medicare* health care service plans, are under the jurisdiction of the Department of Managed Health Care and the Knox-Keene Health Care Service Plan Act of 1975, section 1340 et seq., (and including § 1363.1), as we discuss more fully in part V, subpart F, *post.* (*Solorzano, supra,* 10 Cal.App.4th at p. 1144, fn. omitted; *Smith, supra,* 93 Cal.App.4th at p. 159; *McCall, supra,* 25 Cal.4th at p. 423.) As the *Smith* court determined (and the Legislature has declared), " 'health care service plans . . . are engaged in the business of insurance within the meaning of the McCarran-Ferguson Act.' " (*Smith, supra,* 93 Cal.App.4th at p. 158; and see *U.S. v. Rhode Island Insurers' Insolvency Fund* (1st Cir. 1996) 80 F.3d 616, 620-622.) Accordingly, Aetna's attempt to distinguish its plan because it is a "*Medicare* health care service plan" leads nowhere.

good law and controls this case. Section 1363.1 is therefore preempted here, not only on the basis of [*Erickson*], but also, on the basis of specific federal laws."

The main problem is that Aetna seems to lose sight of whether it is addressing the FAA or the Medicare scheme in its preemption analysis.[11] In arguing that *Smith* did not consider *Medicare* and that the McCarran-Ferguson Act does not apply to *Medicare*, Aetna says nothing at all to undermine the vitality of *Smith*'s holding with respect to the *FAA*. The FAA makes no mention of Medicare or Medicare health care service plans. If Aetna means to argue in the passage quoted above that the *McCarran-Ferguson Act* is inapplicable to the federal Medicare provisions on which Aetna relies, we agree as we explain in part IV, *post* (although this conclusion does not yield the result Aetna says it does). In any case, as Division Three determined in *Smith*, the McCarran-Ferguson Act *does* apply to the FAA, with the result that "the FAA, a federal statute of general application, which does not 'specifically relate' to insurance, is foreclosed from application to prevent the operation of section 1363.1." (*Smith, supra,* 93 Cal.App.4th at p. 162.)

Thus, Aetna's unsupported claims that *Smith* "does not apply" and that *Erickson, in which the court never discussed either the McCarran-Ferguson Act or Medicare,* "controls this case" cannot withstand scrutiny. To the contrary, we find that *Smith* does apply in this case—as far as it goes. More particularly, we agree with Division Three in *Smith* that *Erickson*'s analysis of whether the FAA preempts section 1363.1 does not hold up when the McCarran-Ferguson Act is considered.

## IV. *The McCarran-Ferguson Act Does Not Apply to Medicare.*

At another point in its brief, Aetna argues that "[s]ection 1363.1 is preempted here because there are 'specifically relat[ed]' federal statutes and regulations governing the Medicare program and the health care service plans participating thereunder, *even under* [*Smith*'s] McCarran-Ferguson analysis."[12] (Italics added.) "Under the McCarran-Ferguson Act," Aetna says, "*federal laws which specifically relate to insurance preempt state laws*

---

[11]Under the McCarran-Ferguson Act, "No *Act* of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such *Act* specifically relates to the business of insurance." (15 U.S.C. § 1012(b), italics added.)

[12]We must take issue with Aetna's characterization of the holding in *Smith*. Contrary to Aetna's representation, because of the circumstances presented in that case, Division Three did not even discuss, let alone "h[o]ld that [the *non*-Medicare health plan before it] was *not* extensively regulated by federal law, and that state law requirements were *therefore* applicable to that health plan." (Italics added.)

*purporting to regulate insurance*, while federal laws of general applicability and unrelated to insurance, have no preclusive effect." (Italics added.) In other words, in Aetna's view, if there is any federal legislation "specifically related" to insurance (such as Medicare), the preemption question is resolved. That is not how the McCarran-Ferguson Act or preemption analysis operates.

█ "In the field of insurance regulation, . . . the McCarran-Ferguson Act [(]15 U.S.C. §§ 1011-1015[)] may preclude the application of *normal federal preemption principles* provided three conditions are met." (*U.S. v. Rhode Island Insurers' Insolvency Fund, supra,* 80 F.3d at p. 619, italics added.) This act preserves a state statute from federal preemption where: "(1) the state statute has been enacted 'for the purpose of regulating the business of insurance;' (2) application of the relevant federal statute would 'invalidate, impair, or supersede' that state statute; and (3) the federal statute does not itself 'specifically relate to the business of insurance.' " (*Ruthardt v. U.S.* (D.Mass. 2001) 164 F.Supp.2d 232, 238; *U.S. v. Rhode Island Insurers' Insolvency Fund, supra,* 80 F.3d at p. 619.)

As the United States Supreme Court has explained, consistent with Congress's clear mandate under the McCarran-Ferguson Act, "state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes *unless a federal statute specifically requires otherwise.*" (*Department of Treasury v. Fabe* (1993) 508 U.S. 491, 507 [113 S.Ct. 2202, 2211, 124 L.Ed.2d 449], italics added; *Cochran v. Paco, Inc.* (5th Cir. 1979) 606 F.2d 460, 463 [Congress, by its passage of the McCarran-Ferguson Act, "returned to the states the plenary power to regulate the business of insurance[; i]f Congress intended to invoke its Commerce Clause powers to occupy part of the field of insurance regulation, it would expressly say so"].)

Because Medicare (as opposed to the FAA) is a federal statutory scheme "specifically related to the business of insurance," the McCarran-Ferguson Act *is* inapplicable to this federal act, but the preemptive effect of these "specific federal laws" must be reviewed *within the proper analytical framework*—under conventional preemption principles. (*U.S. v. Rhode Island Insurers' Insolvency Fund, supra,* 80 F.3d at pp. 619, 622; *Ruthardt v. U.S., supra,* 164 F.Supp.2d at p. 238.) █ The " 'purpose of Congress is the ultimate touchstone' *in every pre-emption case.*" (*Medtronic, supra,* 518 U.S. at p. 485 [116 S.Ct. at p. 2250], italics added; *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407].)

V. *Section 1363.1 Is Not Preempted by Medicare.*

█ Although Aetna's discussion of these points intermingles the issues of FAA preemption and Medicare preemption, we examine its insistence that

section 1363.1 is preempted on the basis of either (1) the "all encompassing federal regulatory scheme governing the Medicare program and its contracted Medicare health care service plans" generally or (2) the fact that the "form and substance of [its] arbitration provision . . . , pursuant to federal regulation, were subject to—and received—approval from HCFA" as the arbitration provision was within the definition of "marketing materials." (42 C.F.R. § 422.80 (2001).)

### A. *Medicare.*

As our Supreme Court explained in *McCall, supra,* 25 Cal.4th 412, "The Medicare Act, 42 United States Code section 1395 et seq. (the Act or Medicare), a part of the Social Security Act, established a federally subsidized health insurance program that is administered by the Secretary of Health and Human Services (the Secretary) through the [HCFA (now known as the Centers for Medicare & Medicaid Services (CMS))]. Part A of Medicare, 42 United States Code section 1395c et seq., covers the cost of hospitalization and related expenses that are 'reasonable and necessary' for the diagnosis or treatment of illness or injury. (42 U.S.C. § 1395y(a)(1)(A).) Part B of Medicare (42 U.S.C. § 1395j et seq.) establishes a voluntary supplementary medical insurance program for Medicare-eligible individuals and certain other persons over age 65, covering specified medical services, devices, and equipment. (See 42 U.S.C. §§ 1395k, 1395o.) The Act provides for the delegation of Medicare benefit administration to HMO's, which are authorized, pursuant to contracts with the HCFA, to manage benefit requests by Medicare beneficiaries. (*Wartenberg v. Aetna U.S. Healthcare, Inc.* (E.D.N.Y. 1998) 2 F.Supp.2d 273, 276.)

"The determination *whether an individual is entitled to benefits, and the amount of benefits,* is entrusted to the Secretary in accordance with regulations prescribed by him or her. (42 U.S.C. § 1395ff(a).) Judicial review *of a claim for benefits* is available only after the Secretary has rendered a ' "final decision" ' on the claim, and only in the manner provided for claims for old age and disability benefits arising under the Social Security Act. (*Heckler v. Ringer* (1984) 466 U.S. 602, 605 [104 S.Ct. 2013, 2016-2017, 80 L.Ed.2d 622] . . . ; 42 U.S.C. §§ 405(g), (h), 1395ff(b)(1).) The relevant provisions of the Social Security Act, 42 United States Code section 405(g) and (h), read together, provide that a final decision by the Secretary on a claim 'arising under' Medicare may be reviewed by no person, agency or tribunal except in an action brought in federal district court, and then only after exhausting administrative remedies as described above. (42 U.S.C. §§ 405(h), 1395ii; see 42 U.S.C. §§ 1395ff(b)(1), 1395mm(c)(5)(B).)" (*McCall, supra,* 25 Cal.4th at pp. 416-417, italics added, fn. omitted; *id.* at pp.

423, 425 [concluding that, in enacting Medicare, Congress did *not* intend to displace state tort remedies for claims unrelated to Medicare coverage determinations; "such claims are collateral to, not inextricably intertwined with, Medicare benefit claims"].)

As another court has observed, "The Medicare program, 42 U.S.C. §§ 1395 to 1395ggg (1999), remains a work in progress. Since its inception in 1965, Congress has made countless modifications to it. Continuing in this mode, Congress, as part of the fiscal 1997 budget bill, established the Medicare+Choice Program (the Program). *See* Balanced Budget Act of 1997 (BBA), Pub.L. No. 105-33 § 4001, 111 Stat. 251, 275-328 (codified at 42 U.S.C. §§ 1395w-21 to w-28)." (*Mass. Ass'n of Health Maintenance v. Ruthardt* (1st Cir. 1999) 194 F.3d 176, 177-178, boldface omitted.) Medicare+Choice, the new Medicare part C, "allows a new range of Medicare managed care options."[13] (*McCall, supra,* 25 Cal.4th at p. 423; *Mass. Ass'n of Health Maintenance v. Ruthardt, supra,* 194 F.3d at p. 178 ["Participation in the Program is conditioned on providers offering basic Medicare benefits, meeting certain other statutorily defined criteria, and neither charging more in premiums nor furnishing less in supplemental benefits than the levels established through regulation by the Secretary . . . . *See* 42 U.S.C. §§ 1395w-22, w-24, w-25, w-26"].)

### B. *Express Preemption Principles.*

Our Supreme Court has emphasized that "[t]he BBA [which established the Medicare+Choice program] is noteworthy for its addition of an *express limited* preemption provision to the Medicare Act." (*McCall, supra,* 25 Cal.4th at p. 423, italics and underscoring added.) In *Medtronic, supra,* 518 U.S. 470, the United States Supreme Court specified the proper approach in analyzing a statute that includes *explicit* preemption language. ▇▇▇ Although an express preemption provision may indicate congressional intent to preempt "at least some state law," a court must nevertheless " 'identify the domain expressly pre-empted' by that language." (*Id.* at p. 484 [116 S.Ct. at p. 2250].)

Two presumptions guide the process of determining the scope of an express preemption provision. First, as in answering the threshold question of whether Congress intended preemption to occur, the assumption that preemption will not lie absent evidence of a clear and manifest congressional purpose must also be applied in measuring the "*scope* of [Congress's]

---

[13]"HMO's contracting with Medicare . . . automatically became Medicare+Choice plans effective January 1, 1999." (*McCall, supra,* 25 Cal.4th at p. 423, citing 42 U.S.C. § 1395mm(k).)

intended invalidation of state law." (*Medtronic, supra,* 518 U.S. at p. 485 [116 S.Ct. at p. 2250].) Second, while Congress's intent "primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it[, a]lso relevant . . . is the 'structure and purpose of the statute as a whole,' . . . as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." (*Id.* at pp. 485-486 [116 S.Ct. at pp. 2250-2251].)

C. *The Federal Medicare Scheme and Express Preemption Under the Medicare+Choice Program.*

 We examine the Medicare Act "as it read at the time relevant to this case;" our preemption analysis is based on "then applicable" law.[14] (*McCall, supra,* 25 Cal.4th at pp. 422, 424.)

As noted, there was no express preemption statement in the Medicare Act prior to the introduction of the Medicare+Choice program (with the enactment of the BBA). (*McCall, supra,* 25 Cal.4th at p. 422; *Solorzano, supra,* 10 Cal.App.4th at p. 1141.) To the contrary, the first section of the Medicare Act, entitled "*Prohibition against any Federal interference,*" continues to mandate: "Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; *or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.*" (42 U.S.C. § 1395, italics added; *Solorzano, supra,* 10 Cal.App.4th at pp. 1141-1142; *Massachusetts Medical Soc. v. Dukakis* (1st Cir. 1987) 815 F.2d 790, 791 [construing 42 U.S.C. § 1395 as explicitly stating an intent to minimize federal intrusion in the area of medical services for the elderly].) Indeed, before the BBA's enactment, the Medicare Act specifically required Medicare providers to be *state* licensed. (*McCall, supra,* 25 Cal.4th at p. 423, citing 42 U.S.C. § 1395mm(b).)

This requirement is maintained in the Medicare+Choice program. As a general matter, "a Medicare+Choice organization *shall be organized and licensed under State law* as a risk-bearing entity *eligible to offer health insurance or health benefits coverage in each State in which it offers a Medicare+Choice plan.*" (42 U.S.C. § 1395w-25(a)(1), italics added.) Under

---

[14]Aetna attempts to rely on amendments effective *after* its marketing materials were approved and disseminated (and after Pagarigan's death). We will discuss these subsequent amendments in due course.

specified circumstances (if, for example, the state fails to act on the license application in a timely manner), the state-licensing requirement may be waived. (42 U.S.C. § 1395w-25(a)(2)(A)-(D).) Significantly, however, such waiver "is conditioned upon the organization's compliance with *all consumer protection and quality standards*" insofar as such standards *"would apply in the State to the organization if it were licensed under State law,"* "are generally applicable to other Medicare+Choice organizations and plans in the State," *and "are consistent with the standards established under this part."* (42 U.S.C. § 1395w-25(a)(2)(E)(iii) & (G)(i), underscoring and italics added.)

Section 1395w-21 of 42 of the United States Code addresses "eligibility, election and enrollment" and authorizes the Secretary to establish procedures for the dissemination of information to Medicare beneficiaries. This provision prohibits Medicare+Choice organizations from distributing "marketing material" or application forms unless the material or forms have been submitted to the Secretary for review at least 45 days before the proposed distribution date and the Secretary "has not disapproved" the distribution of such material. (42 U.S.C. § 1395w-21(h)(1).) The standards established under section 1395w-26 shall include guidelines for the review of marketing materials, and the Secretary "shall" disapprove material that is "materially inaccurate or misleading or otherwise makes a material misrepresentation." (42 U.S.C. § 1395w-21(h)(2).)

Under the heading "[p]rohibition of certain marketing practices," the same section specifies that "[e]ach Medicare+Choice organization shall conform to fair marketing standards [with respect to its Medicare+Choice plan] included in the standards established under section [1395w-26 of Title 42 of the United States Code]." Such standards "shall not permit a Medicare+Choice organization to provide for cash or other monetary rebates as an inducement for enrollment or otherwise" and "may" prohibit any Medicare+Choice organization or its agent from completing any portion of an individual's election form. (42 U.S.C. § 1395w-21(h)(4).)

"[A]t the time of enrollment and at least annually thereafter," the Medicare+Choice organization must disclose certain plan information, such as service area, benefits and supplemental benefits, access, out-of-area and emergency coverage, prior authorization rules, grievance and appeals procedures and its quality assurance program. (42 U.S.C. § 1395w-22(c)(1).) Each Medicare+Choice organization "must provide meaningful procedures for hearing and resolving grievances" between the organization and enrollees. (42 U.S.C. § 1395w-22(f).)

In section 1395w-26 of 42 of the United States Code, Congress authorized the Secretary to establish certain standards under the Medicare+Choice

program and, at the same time, explicitly delineated the *limited* preemptive effect of these standards:

## "(b) Establishment of other standards

### "(1) In general

"*The Secretary shall establish by regulation* other *standards* (not described in subsection (a) [establishing 'solvency standards for provider-sponsored organizations']) for Medicare+Choice organizations and plans *consistent with, and to carry out, this part.* The Secretary shall publish such regulations by June 1, 1998. In order to carry out this requirement in a timely manner, the Secretary may promulgate regulations that take effect on an interim basis, after notice and pending opportunity for public comment.

### "(2) Use of current standards

"Consistent with the requirements of this part, standards established under this subsection shall be *based on standards established under* section 1876 [(*42 U.S.C. § 1395mm*) (governing Medicare risk and cost contracts with HMOs and competitive medical plans) (*McCall, supra,* 25 Cal.4th at p. 423)] to carry out *analogous* provisions of such section.

### "(3) Relation to State laws

### "(A) In general

"*The standards established under this subsection shall supersede any State law or regulation* (including standards described in subparagraph (B)) with respect to Medicare+Choice plans which are offered by Medicare+Choice organizations under this part *to the extent such law or regulation is inconsistent with such standards.*

### "(B) Standards specifically superseded

"State standards relating to the following are superseded under this paragraph:

"(i) Benefit requirements.

"(ii) Requirements relating to the inclusion or treatment of providers.

"**(iii)** Coverage determinations (including related appeals and grievance procedures)."[15] (42 U.S.C. § 1395w-26(b), italics and underlining added.)

If the Secretary determines that a Medicare+Choice organization has misrepresented or falsified information furnished to the Secretary or an individual or other entity, "*in addition to any other remedies authorized by law*," the Secretary may provide for certain civil money penalties, suspension of enrollment of individuals or suspension of payment to the organization. (42 U.S.C. § 1395w-27(g)(1)(E), (2), italics added.)

D. *Applicable Federal Regulations.*

The regulations promulgated under the Medicare+Choice program are set forth in title 42 of the Code of Federal Regulations, section 422.1 et seq. (2001) Section 422.111 specifies "[d]isclosure requirements." At all times relevant here, this section stated that a Medicare+Choice organization must include information regarding its service area, benefits, access, out-of-area coverage, emergency coverage, supplemental benefits, prior authorization and review rules, grievance and appeals procedures, quality assurance program and disenrollment rights and responsibilities. (63 Fed.Reg. 34968, 35077 (June 26, 1998), amended Feb. 17, 1999, 64 Fed.Reg. 7968, 7980.)

Further, Code of Federal Regulations, title 42, part 422.111(d) (1998) then provided that if a Medicare+Choice organization "intends to change its rules" for a Medicare+Choice plan, it "must [s]ubmit the changes for HCFA review under the procedures of [section] 422.80."[16] (63 Fed.Reg. 34968, 35077 (June 26, 1998), amended Feb. 17, 1999, 64 Fed.Reg. 7968, 7980.)

Part 422.80 of title 42 of the Code of Federal Regulations (1998) (the federal authority on which Aetna primarily relies) addressed the "[a]pproval of marketing materials and election forms." The term "marketing materials" was defined to include "[m]embership communication materials such as membership rules, subscriber agreements (evidence of coverage) [and] member handbooks . . . ." (42 C.F.R. § 422.80(b)(5)(v), 63 Fed. Reg. 35071 (June 26, 1998), amended Oct. 1, 1998, 63 Fed.Reg. 52612.) Paragraph (a) of section 422.80 stated that marketing materials may not be distributed unless they have been submitted to HCFA "for review under the guidelines in paragraph (c)" at least 45 days before their distribution and HCFA has "not disapproved" them.

---

[15]Aetna does not contend that any of these latter provisions under which state standards are "specifically superseded" (42 U.S.C. § 1395w-26(b)(3)(B)(i)-(iii)) are triggered here.

[16]The organization was also to "notify" all enrollees "by the previous October 15" for changes taking effect on January 1 and "at least 30 days before the intended effective date of the changes" for all other changes. (63 Fed.Reg. 34968, 35077 (June 26, 1998), amended Feb. 17, 1999, 64 Fed.Reg. 7968, 7980.)

According to HCFA review "[g]uidelines," HCFA would determine whether the marketing materials provided the following: "(i) Adequate written description of rules (including any limitations on the providers from whom services can be obtained), procedures, basic benefits and services, and fees and other charges. [¶] (ii) Adequate written description of any supplemental benefits and services. [¶] (iii) Adequate written explanation of the grievance and appeals process, including differences between the two, and when it is appropriate to use each. [¶] (iv) Any other information necessary to enable beneficiaries to make an informed decision about enrollment." (42 C.F.R. § 422.80(c)(1) (1998).) It would also ascertain that the materials "[c]ontain no statements that are inaccurate or misleading or otherwise make misrepresentations."[17] (42 C.F.R. § 422.80(c)(1) (1998).)

Paragraph (e) of section 422.80 of title 42 of the Code of Federal Regulations (1998) listed prohibited and mandated marketing practices: "(1) In conducting marketing activities, [Medicare+Choice] organizations may not: [¶] (i) Provide for cash or other monetary rebates as an inducement for enrollment or otherwise. This does not prohibit explanation of any legitimate benefits the beneficiary might obtain as an enrollee of the [Medicare+Choice] plan, such as eligibility to enroll in a supplemental benefit plan that covers deductibles and coinsurance, or preventive services. [¶] (ii) Engage in any discriminatory activity such as, for example, attempts to recruit Medicare beneficiaries from higher income areas without making comparable efforts to enroll Medicare beneficiaries from lower income areas. [¶] (iii) Solicit door-to-door for Medicare beneficiaries. [¶] (iv) Engage in activities that could mislead or confuse Medicare beneficiaries, or misrepresent the [Medicare+Choice] organization. The [Medicare+Choice] organization may not claim that it is recommended or endorsed by HCFA or Medicare or that HCFA or Medicare recommends that the beneficiary enroll in the [Medicare+Choice] plan. It may, however, explain that the organization is approved for participation in Medicare. [¶] (v) Distribute marketing materials for which, before expiration of the 45-day period, the [Medicare+Choice] organization receives from HCFA written notice of disapproval because it is inaccurate or misleading, or misrepresents the [Medicare+Choice] organization, its marketing representatives, or HCFA.

"(2) In its marketing, the [Medicare+Choice] organization must: [¶] (i) Demonstrate to HCFA's satisfaction that marketing resources are allocated

---

[17]There were additional guidelines about notifying the public of an organization's enrollment period, advising that because either HCFA or the organization could refuse to renew their contract, the beneficiary's enrollment could be terminated as a result and, for markets "with a significant non-English speaking population," providing materials in such language. (42 C.F.R. § 422.80(c)(2), (3), (5) (1998).)

to marketing to the disabled Medicare population as well as beneficiaries age 65 and over. [¶] (ii) Establish and maintain a system for confirming that enrolled beneficiaries have in fact, enrolled in the [Medicare+Choice] plan, and understand the rules applicable under the plan." (42 C.F.R. § 422.80(e)(1), (2) (1998).)

Finally, section 422.402 of title 42 of the Code of Federal Regulations pertains to "Federal preemption of State law."[18] This regulation specified that, except for state laws pertaining to benefit requirements, inclusion or treatment of providers and suppliers and coverage determinations which are "specifically superseded," "standards established under this part supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to [Medicare+Choice] organizations and their [Medicare+Choice] plans *only to the extent that such State laws are inconsistent with the standards established under this part.*" (42 C.F.R. § 422.402(a), (b) (1998), italics added.) Otherwise, *"nothing in this section may be construed to affect or modify the provisions of any other law or regulation that imposes* or preempts *a specific State authority."* (42 C.F.R. § 422.402(c) (1998), italics added.)

### E. *HCFA's Construction.*

The preamble to HCFA's request for final comments on the interim final rule implementing the amendments (which our Supreme Court quoted in

---

[18]"(a) General preemption. Except as provided in paragraph (b) of this section, the rules, contract requirements, and standards established under this part supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to M+C organizations and their M+C plans only to the extent that such State laws are inconsistent with the standards established under this part. This preemption of State laws and other standards applies only to coverage pursuant to an M+C contract, and does not extend to benefits outside of such contract or to individuals who are not M+C enrollees of an organization with an M+C contract.

"(b) Specific preemption. As they might otherwise apply to the M+C plans of an M+C organization in a State, State laws and regulations pertaining to the following areas are specifically preempted by this part: [¶] (1) Benefit requirements, such as mandating the inclusion in an M+C plan of a particular service, or specifying the scope or duration of a service (for example, length of hospital stay, number of home health visits). State cost-sharing standards with respect to any benefits are preempted only if they are inconsistent with this part, as provided for in paragraph (a) of this section. [¶] (2) Requirements relating to inclusion or treatment of providers and suppliers. [¶] (3) Coverage determinations (including related appeal and grievance processes for all benefits included under an M+C contract). Determinations on issues other than whether a service is covered under an M+C contract, and the extent of enrollee liability under the M+C plan for such a service, are not considered coverage determinations for purposes of this paragraph.

"(c) Except as provided in paragraphs (a) and (b) of this section, nothing in this section may be construed to affect or modify the provisions of any other law or regulation that imposes or preempts a specific State authority." (42 C.F.R. § 422.402 (1998), italics omitted.)

*McCall*) states as follows: "Prior to the BBA, section 1876 of the Act [42 U.S.C. § 1395mm)] (governing Medicare risk and cost contracts with HMOs and competitive medical plans) did not contain any specific preemption provisions. However, section 1876 requirements could preempt a State law or standard based on general constitutional Federal preemption principles, consistent with the provisions of Executive Order 12612 on Federalism. Under the guidelines of the Executive Order, section 1876 requirements did not preempt a State law or standard unless the law or standard was *in direct conflict with* the Federal law, or it *prevented the organization from complying with the Federal law*.

"Put another way, *if Federal law permitted the HMO to do what State law required, there was no preemption. In practice, rarely, if ever, did Federal law preempt State laws affecting Medicare prepaid plans.* For example, Medicare risk plans operating in States with mandated benefit laws were generally required to comply with such State laws. Compliance with the State mandated benefit law was not viewed as interfering with the ability of plans to function as Medicare risk contractors under Federal standards. . . .

"General preemption: The general preemption provision of the BBA will be applied in the same way that the Executive Order has been applied, in that *State laws or standards will be preempted only when they are inconsistent with [Medicare+Choice] standards, as clearly indicated in the statute.* Because the BBA requires that [certain Medicare+Choice organizations] operating under a waiver of the State licensure requirement must comply with State quality and consumer protection standards, it seems clear that the Congress expected States, in some cases, to have more rigorous or more comprehensive standards for quality and consumer protection which would enhance, rather than duplicate or be subsumed under, the [Medicare+Choice] standards for quality and consumer protection. Thus, unless one of the *specific* preemptions . . . applies, *State laws* or standards *that are more strict* than the [Medicare+Choice] standards would *not* be preempted *unless they prevented compliance with the [Medicare+Choice] requirements.* . . . [T]here are *likely* to be quality and *consumer protection standards* imposed by States that all [Medicare+Choice] plans must comply with, and *for which there is no Federal preemption.*" (63 Fed.Reg. 34968, 35012 (June 26, 1998), italics added; *McCall, supra,* 25 Cal.4th at pp. 423-424.)

F. *Section 1363.1 and the Knox-Keene Health Care Service Plan Act.*

Section 1363.1, the California statute mandating certain disclosures on the enrollment form of *any* health care service plan requiring binding arbitration

(disclosures Aetna failed to provide), is part of the Knox-Keene Health Care Service Plan Act of 1975. (§ 1340 et seq.) *Regardless of whether plan beneficiaries are Medicare beneficiaries or otherwise,* California regulates health care service plans (which Aetna acknowledges that it is) under this act.[19] Indeed, other than where limited exceptions are expressly noted, the Health Care Service Plan Act applies to plans accepting Medicare beneficiaries as enrollees *by its express terms.* (E.g., §§ 1363, 1363.05, 1367.12 & 1367.15; *Solorzano, supra,* 10 Cal.App.4th at pp. 1144-1145.)

The Department of Managed Health Care (formerly the Department of Managed Care) is charged with the "execution of the laws of this state relating to health care service plans and the health care service plan business including, but not limited to, those laws directing the department to ensure that health care service plans provide enrollees with access to quality health care services and *protect and promote the interests of enrollees.*"[20] (§ 1341, subd. (a), italics added.) Among its stated goals, the Legislature has indicated its intent to ensure that enrollees are "educated and informed of the benefits and services available in order to enable a rational consumer choice in the marketplace" and to protect against fraudulent solicitations, deceptive methods, misrepresentations and other "practices which are inimical to the general purpose of enabling a rational choice for the consumer public." (§ 1342, subds. (b), (c).)

Health care service plans are required to be licensed under the act (§§ 1349, 1351), must disclose their financial records to the director (§ 1351.1) and must pay designated fees to cover the administration of the act (§ 1356). Detailed provisions address standards for plan solicitations, advertising and disclosure forms. (§§ 1359-1363; *Solorzano, supra,* 10 Cal.App.4th at pp. 1144-1145 & fn. 11.) Each plan is required to make specified disclosures regarding plan benefits, services and contract terms (including the fact that the plan uses arbitration to settle disputes if it does) "so as to afford the public, subscribers and enrollees with a full and fair disclosure of the provisions of the plan in readily understood language and in a clearly organized manner." (§ 1363, subd. (a).) More particularly, as stated in the next section of the act, "[a]*ny* health care service plan" that requires binding arbitration *must provide a clear, prominently displayed statement of*

---

[19] A "[h]ealth care service plan" includes any organization that "undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (§ 1345, subd. (f).)

[20] The Director of the Department of Managed Health Care is responsible for executing all powers and jurisdiction and discharging all obligations vested by law in the department. (§ 1341, subds. (b), (c).)

*that fact, in the language specified, immediately above the signature line of the enrollment form signed by the enrollee.* (§ 1363.1, italics added.)

Without specifying any exclusions applicable to Medicare health care service plans, the act permits the director to suspend or revoke a health care service plan's license for violating any provision of the act (§ 1386), to sue for civil penalties (§ 1387), to issue cease-and-desist orders (§ 1391), to seek injunctive relief (§ 1392) and to seek involuntary dissolution of the plan (§ 1394.1-1394.3), and any person who willfully violates the act is subject to criminal prosecution (§ 1390).

### G. *Congress Has Not Occupied the Field.*

As the foregoing review of federal authority demonstrates, whether we look to Medicare provisions in general or to provisions regarding "marketing material" in particular, the Medicare scheme is *not* "all encompassing" or "pervasive" as Aetna has characterized it. Not only does this argument ignore the *limited express* preemption provision at issue here, but it ignores the Medicare scheme overall. Because the "first section of the Medicare Act explicitly states [Congress's] intent to minimize federal intrusion in the area" and because the Medicare Act specifically requires that Medicare HMO's be *state*-licensed, our Supreme Court in *McCall* observed that, "[b]y clear implication," even before the BBA's enactment, "*Congress left open a wide field for the operation of state law* pertaining to standards for the practice of medicine and the manner in which medical services are delivered to Medicare beneficiaries." (*McCall, supra,* 25 Cal.4th at pp. 422-423, italics added.)

In fact, a decade ago, before the introduction of Medicare+Choice and its express preemption provisions, Division One considered whether federal Medicare statutes regulating HMO's preempted the plaintiffs' claims for injunctive relief under Business and Professions Code section 17200 et seq. based on their dissatisfaction with the marketing practices an HMO employed to solicit and enroll Medicare recipients. (*Solorzano, supra,* 10 Cal.App.4th 1135.) By congressional mandate as stated in section 1395w-26 of 42 of the United States Code, the statutes and regulations we consider here are "based on" (and are virtually indistinguishable from) the "analogous" provisions considered in *Solorzano* (with the obvious exception of the express preemption provision added to the Medicare+Choice framework). (42 U.S.C. § 1395w-26(b)(2); *Solorzano, supra,* 10 Cal.App.4th at pp. 1141-1143.) Because the *Solorzano* court thoroughly and thoughtfully examined Medicare provisions pertaining to marketing practices *which directly parallel*

*the provisions we consider here* (as well as various provisions of the Knox-Keene Health Care Service Plan Act (§ 1340 et seq.)), we find the opinion particularly instructive. (*Solorzano*, at pp. 1139-1149.)

In finding that Congress had not occupied the field to displace state regulation of marketing practices, the *Solorzano* court commented, "Even if the federal Medicare statute is viewed as 'comprehensive,' that fact does not persuade in favor of preemption [citation] where, as here, Congress has expressed an intent to minimize federal intrusion into the administration of the Medicare program (42 U.S.C. § 1395) and where, as here, the subject of regulation (public health) is a matter traditionally left to the police powers of the states." (*Solorzano, supra,* 10 Cal.App.4th at pp. 1146-1147, citing *Massachusetts Medical Soc. v. Dukakis, supra,* 815 F.2d at p. 795 ["a state is ordinarily as concerned as the federal government to see that its elderly citizens enjoy medical care"].)

Moreover, as our Supreme Court emphasized in *McCall*: "By its terms, Medicare now [upon the enactment of the BBA and the introduction of the Medicare+Choice program] preempts state laws mandating benefits to be covered, mandating inclusion of providers and suppliers, and coverage determinations. (42 U.S.C. § 1395w-26(b)(3).) . . . *All other types of state laws not inconsistent with Medicare standards are permitted.*" (*McCall, supra,* 25 Cal.4th at p. 423, italics added.)

H. *State Law Is Not "Inconsistent" with Federal Law.*

Because (at the relevant time) "marketing material" was not one of the three areas of state regulation "specifically superseded," the only remaining question is whether section 1363.1 is consistent or inconsistent with the pertinent federal regulations promulgated by the Secretary "to carry out" the Medicare+Choice program. (42 U.S.C. § 1395w-26(b)(3)(B).) As Congress has expressly stated, state standards regarding matters outside the specified areas are superseded *only* to the extent any state regulation is *"inconsistent"* with such federal regulations. (42 U.S.C. § 1395w-26(b)(3)(A), italics added.) Aetna maintains that it is inconsistent for section 1363.1 to apply to the arbitration provision within Aetna's EOC because EOC's are submitted to HCFA for approval. We disagree.

Historically, the inconsistency requiring preemption has meant the conflict that arises when "compliance with both federal and state regulations is a physical impossibility" (*Florida Avocado Growers v. Paul* (1963) 373 U.S. 132, 142-143 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248]) or when, under the

circumstances of the particular case, state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines v. Davidowitz* (1941) 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581]; *Medtronic, supra,* 518 U.S. at p. 507 [116 S.Ct. at p. 2261]; *Gade, supra,* 505 U.S. at p. 98 [112 S.Ct. at p. 2383]; *Solorzano, supra,* 10 Cal.App.4th at p. 1148.) A state's imposition of a stiffer penalty or a higher standard of care than mandated by federal law does not preclude state regulation. (*Solorzano, supra,* 10 Cal.App.4th at pp. 1147-1148.)

Further, contrary to Aetna's position, Congress's imposition of a state licensing requirement for Medicare+Choice organizations is significant, as our Supreme Court observed in *McCall*.[21] (*McCall, supra,* 25 Cal.4th at p. 423.) In fact, Congress expressly conditioned any waiver from the state licensing requirement on the Medicare+Choice organization's compliance with "all consumer protection . . . standards" that "*would* apply in the State to the organization if it *were* licensed under State law" as long as such standards were also generally applicable in the state and "consistent with" standards established for the Medicare+Choice program. (42 U.S.C. § 1395w-25(a)(2)(E)(iii) & (G)(i)(I)-(III), italics added.)

Guided by this expression of Congress's intent, the HCFA, in turn, specifically acknowledged the likelihood of "more rigorous or more comprehensive" state consumer protection standards (as compared to federal standards) with which "*all [Medicare+Choice] organizations must comply . . . and for which there is no Federal preemption*"; in the HCFA's view, as long as they did not "prevent compliance" with federal requirements, such state standards would "enhance, rather than duplicate or be subsumed under" federal Medicare+Choice standards. (63 Fed.Reg. 34968, 35012 (June 26, 1998); *Medtronic, supra,* 518 U.S. at p. 496 [116 S.Ct. at p. 2255], citing *Hines v. Davidowitz, supra,* 312 U.S. at p. 67 [61 S.Ct. at p. 404] [the federal agency to which Congress has delegated its authority to implement the provisions of the federal act is "uniquely qualified to determine whether a particular form of state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' "].)

As the *Solorzano* court concluded under particularly analogous circumstances, we find no inconsistency between the federal statutes and regulations on the one hand and section 1363.1 on the other; to the contrary, section 1363.1 adds a further measure of consumer protection wholly *consistent* with the standards specified under the Medicare+Choice program.

---

[21]According to Aetna, notwithstanding the requirement that Medicare health care service plans must be "[o]rganized and licensed under state law" (42 U.S.C. § 1395w-25(a)(1)), "[n]othing in either federal law or [*McCall*] requires Medicare health care service plans to 'operate' under, or be subject to, state law."

(*Solorzano, supra,* 10 Cal.App.4th at p. 1148.) In the same vein as the more broadly drawn federal "guidelines" for providing "adequate written description" of plan features to enable Medicare beneficiaries to "make an informed decision about enrollment," by mandating a clear, prominent statement of any arbitration requirement before the signature line of a plan enrollment form, section 1363.1 is similarly directed toward "full and fair disclosure of the plan." (42 C.F.R. § 422.80(c) (2001); §§ 1363, subd. (a)(10), 1363.1.) On this record, we see no reason why a Medicare health care service plan could not comply with both schemes; moreover, rather than "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," section 1363.1 serves to advance the same goals.[22] (*Medtronic, supra,* 518 U.S. at p. 507 [116 S.Ct. at p. 2261]; *Gade, supra,* 505 U.S. at p. 98 [112 S.Ct. at p. 2383]; *Hines v. Davidowitz, supra,* 312 U.S. at p. 67 [61 S.Ct. at p. 404]; *Florida Avocado Growers v. Paul, supra,* 373 U.S. at pp. 142-143 [83 S.Ct. at pp. 1217-1218].)

I. *Recent Amendments Do Not Warrant a Contrary Result.*

■ Aetna purports to rely on an amendment adding "[r]equirements relating to marketing materials . . . regarding a Medicare+Choice plan" to the three other subject matters (none of which is implicated here) "specifically superseded" by federal regulation (as well as an August 2001 injunction granted by a federal district court in another case pursuant to this amendment). (42 U.S.C. § 1395w-26(b)(3)(B)(iv) (2002).) There is no dispute that the EOC satisfies the federal definition of "marketing material." However, as Aetna necessarily admits, this legislation was enacted on December 21, 2000—*after* Aetna's EOC received HCFA approval (in Jan. 2000) and, indeed, *after* Pagarigan's death (the following June). (Pub.L. No. 106-554 (Dec. 21, 2000) 114 Stats. 2763, 2763A-561.) Critically, Congress specified that this amendment "take[s] effect on the date of the enactment of this Act [Dec. 21, 2000]."[23] (*Ibid.*) We find this mandate to be clear enough but further note that related amendments emphasize the prospective nature of this change in the law.

At the same time it added this new category to the short list of subjects specifically superseded, Congress enacted another amendment (also to take

---

[22]For the same reasons we conclude that Congress did not intend to preempt section 1363.1, we reject Aetna's abstention argument (citing *Desert Healthcare Dist. v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781, 794 [114 Cal.Rptr.2d 623], a case in which the court found abstention appropriate in matters of "complex economic policy"). (*Solorzano, supra,* 10 Cal.App.4th at p. 1148, fn. 14; *Congress of Cal. Seniors v. Catholic Healthcare West* (2001) 87 Cal.App.4th 491, 510-511 & fn. 14 [104 Cal.Rptr.2d 655].)

[23]Accordingly, in a February 2001 letter, HCFA informed states of the amendment and also advised that the new specific prohibition against state regulation of marketing materials "appl[ies] to marketing materials *submitted after December 21, 2000.*" (Italics added.)

effect on Dec. 21, 2000): "The Secretary may not implement, other than at the beginning of a calendar year, regulations under this section that impose new, significant regulatory requirements on a Medicare+Choice organization or plan." (42 U.S.C. § 1395w-26(b)(4) (2002); Pub.L. No. 106-554 (Dec. 21, 2000) 114 Stats. 2763, 2763A-560.) Along with those changes, Congress also added a provision for the "[s]pecial treatment [including expedited approval] of marketing material following model marketing language" which would be specified by the Secretary. (42 U.S.C. § 1395w-21(h)(5) (2002); Pub.L. No. 106-554 (Dec. 21, 2000) 114 Stats. 2763, 2763A-560.) These amendments "shall apply to marketing material submitted on or after January 1, 2001." (*Ibid.*)

When Congress intends to preempt state law, it knows how to do so. (*Jones v. Rath Packing Co., supra,* 430 U.S. at pp. 530-532 [97 S.Ct. at pp. 1312-1313] [considering federal legislation prohibiting the imposition of labeling requirements "in addition to, or different than, those made under" the congressional act].) To paraphrase the *Solorzano* court, when the Medicare+Choice program was introduced, Congress was presumably aware of the fact that some states (including California) had statutes restricting HMO marketing practices, yet took no step toward federal preemption of such statutes until December 2000.[24] (*Solorzano, supra,* 10 Cal.App.4th at pp. 1148-1149.) Indeed, prior to that time, Congress indicated and later expressly stated just the opposite intention. Taken together, these subsequent amendments establish that Congress intended for federal law to preempt state regulation of Medicare+Choice marketing materials *prospectively.*[25] (See *Mass. Ass'n of Health Maintenance v. Ruthardt, supra,* 194 F.3d at p. 183.)

### DISPOSITION

The petition is granted. Let a peremptory writ issue directing the trial court to vacate its orders of September 20, 2001, November 8, 2001, April 9,

---

[24]California's Health Care Service Plan Act was enacted in 1975. (*Solorzano, supra,* 10 Cal.App.4th at p. 1149, fn. 15.)

[25]Pagarigan's children further argue that Aetna cannot compel arbitration of their wrongful death claims based on an agreement executed by their mother, that Aetna, Inc., is not a party to the arbitration agreement, that the arbitration provision is adhesive and unconscionable, that Aetna failed to provide required notice and that the trial court failed to exercise its discretion under Code of Civil Procedure section 1281.2, subdivision (c). At oral argument, counsel for Pagarigan's children cited the recent decision in *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711 [124 Cal.Rptr.2d 607], in support of this last contention relating to Code of Civil Procedure section 1282.2, and we allowed both sides to submit supplemental letter briefs to address this decision. In light of our determination of the preemption issue, however, we need not consider any of these other issues.

We deny the requests for judicial notice presented by Pagarigan's children and resolve this matter on the record before us.

2002, and May 31, 2002, and to issue a new and different order denying Aetna's petition to compel arbitration.

Johnson, Acting P. J., and Perluss, J., concurred.